UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

**05    10524 RCL**

LESLIE T HASKINS, INC., d/b/a HASKINS
OLDSMOBILE, a Massachusetts corporation,

    Plaintiff,

vs.

GENERAL MOTORS CORPORATION,
a Delaware Corporation

    Defendant.

CIVIL ACTION
CASE NO.

MAGISTRATE JUDGE _____

RECEIPT # 62884
AMOUNT $_____
SUMMONS ISSUED ___
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY CLK ___
DATE 3/14/05

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff, Leslie T. Haskins, Inc., d/b/a Haskins Oldsmobile ("Haskins"), sues General Motors

Corporation ("GM") and states:

1.    Plaintiff is a Massachusetts corporation organized and existing under the laws of the

Commonwealth of Massachusetts with its principal place of business in Wellesley, Massachusetts.

Plaintiff is a "motor vehicle dealer" as defined in Massachusetts General Laws ("MGL") ch. 93B,

§ 1 and is a party to an existing franchise agreement as defined in MGL ch. 93B, §1 with the

Oldsmobile Division of General Motors Corporation.

2.    Defendant General Motors Corporation ("GM"), is a foreign corporation organized

and existing under the laws of the State of Delaware with its principal place of business in Detroit,

Michigan.  GM is a manufacturer of new motor vehicles including the Chevrolet, Oldsmobile,

Cadillac, Pontiac, Buick and GMC Truck line-make, and it distributes such vehicles to dealers such

as Plaintiff.  GM is a "manufacturer" as defined by MGL ch. 93B, § 1.

3.    This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332 by diversity

of citizenship.   The matter in controversy exceeds the sum or value of $75,000.00 exclusive of

interest and costs, and is between citizens of different states.

4.      Plaintiff has been an Oldsmobile dealer for approximately 75 years and has maintained an Oldsmobile franchise agreement with GM at all times material hereto. The Plaintiff has invested substantial time, effort, and monies in renovation of its Oldsmobile facility and the promotion of Oldsmobile and General Motors products.

5.      Over the ensuing years, Plaintiff substantially increased sales of the Oldsmobile Brand in and around its market area and has enhanced the goodwill associated with all GM Brands.

6.      By letter dated December 12, 2000, a copy of which is attached hereto as **Exhibit A**, GM notified Plaintiff of its intent to terminate or non-renew Plaintiff's Oldsmobile franchise, as well as all other Oldsmobile franchises in the United States. This announcement was subject to amendment of intention and GM steadfastly maintained that it had not acted to non-renew or otherwise terminate any Oldsmobile dealer by virtue of the preliminary announcement , which by definition was subject to change. Upon information and belief, subsequent to the December 12th announcement, GM has acted to eliminate the substantial majority of once existing Oldsmobile dealers by various means and measures. GM produced the last Oldsmobile in April 2004, depriving Oldsmobile dealers who remain, including Plaintiff, of an adequate and sufficient supply of vehicles. GM has destroyed the entire value and transferability of Plaintiff's Oldsmobile franchise.

7.      By letter dated October 27, 2004, GM finally notified Plaintiff that its Oldsmobile Dealer Sales and Service Agreement, which is set to expire on October 31, 2005, will not be renewed.

8.      As a result of GM's conduct Plaintiff has, in fact, lost the complete value of its Oldsmobile franchise and presently has virtually no marketable product to sell. Within a short time, Plaintiff will have no Oldsmobile product to sell at all. GM, at all times prior to its December 12, 2000, announcement, represented that the longevity of the Oldsmobile line-make was assured as

2

evidenced by GM's inclusion of a renewal provision in the franchise agreement offered to Plaintiff during October of 2000. Furthermore, GM represented that it planned an expansion of the models to be offered under the Oldsmobile moniker and made representations that GM did not contemplate, intend, or plan the discontinuation, phase out, or termination of the Oldsmobile line or the termination of Oldsmobile franchises notwithstanding that rumors of such a discontinuation abounded in the automotive retail sales community. With specific reliance upon these representations made by GM, Plaintiff made and continued to make substantial investments in land or land leases, improvements, employees, training, tools, machinery, inventory, advertising, equipment, parts, and goodwill based upon GM's continuing expressed commitment to provide Oldsmobile products for sale.

9.     Upon information and belief, GM determined well before the December 12, 2000 announcement to terminate the Oldsmobile brand for reasons related to GM inter-brand competition, consolidation of the GM dealer network, the implementation of GM's "channeling strategy" and other reasons unrelated to profitability. GM studied, examined, and analyzed the termination of Oldsmobile and employed internal measures to terminate the Oldsmobile brand. These steps included: scaling back funding for and investment in the Oldsmobile Division; planning for the scaling back of Oldsmobile production; amendment of certain Oldsmobile dealer ancillary agreements such as Exclusivity Agreements to provide for the elimination of Oldsmobile without violating the express terms of such agreements; planning the transfer of Oldsmobile product to other GM divisions; reducing the Oldsmobile Division staff by planned transfer or termination; terminating or failing to renew or purchase some select Oldsmobile franchises; creating studies to examine the various effects upon GM of eliminating Oldsmobile relating to the cost of elimination; planning the reconstitution of the GM dealer network without Oldsmobile dealers; and combining

3

GM brands in light of the planned Oldsmobile termination. GM failed to advise Plaintiff of these plans or decisions and, in fact, concealed these activities from Plaintiff.

10.    Upon information and belief, GM has obtained Haskins's customer lists and is using those lists and Haskins's established goodwill associated with the Oldsmobile brand to lure Oldsmobile dealers to purchase other GM brands, and Haskins has been damaged therefrom.

11.    Plaintiff is presently under a renewed contract ("Sales and Service Agreement") with GM as a dealer of GM products. The Sales and Service Agreement was entered into as of November 1, 2000, and expires on October 31, 2005. The Sales and Service Agreement incorporates pre-printed, uniform, and completely non-negotiable "Standard Provisions" which are included within every GM dealer contract. The pre-printed, non-negotiable, uniform Standard Provisions contain a variety of provisions addressing topics from choice of law to the assignment of rights. The Sales and Service Agreement guarantees Plaintiff, among other things, the right to sell GM's Oldsmobile Division line of automobiles. The Sales and Service Agreement is construed under Michigan law pursuant to the choice of law provision in the contract. The Sales and Service Agreement is described by GM as a personal services contract and under Michigan law is not subject to the Uniform Commercial Code. The Sales and Service Agreement is not subject to Michigan's economic loss doctrine. The contract provisions were authored by GM in all respects and any doubts regarding the meaning of any provision therein must be construed against GM and in favor of Plaintiff. A true and correct copy of the Sales and Service Agreement, identified as **Exhibit B**, is attached hereto and made a part hereof by reference.

12.    The fundamental purpose of Plaintiff's GM Sales and Service Agreement is to authorize Plaintiff, "to sell and service General Motors Products and represent itself as a GM Dealer." (**Exhibit B**, Standard Provisions—"Purpose of Agreement").

4

13.    The Sales and Service Agreement provides specific circumstances by which the parties may terminate the Agreement. None of the termination provisions are applicable to this action and none include the discontinuation of a line-make, such as Oldsmobile, as grounds for termination of a Sales and Service Agreement by GM. (**Exhibit B**, Article 14; referred to as "Standard Provisions.") Furthermore, pursuant to Massachusetts law, franchise agreements are perpetual unless terminated in accordance with the law. *See* MGL ch. 93B, § 5.

14.    The Sales and Service Agreement between Plaintiff, as franchised dealer, and GM, as manufacturer, had an initial term of five (5) years. However, the Agreement further provided that GM "assures Plaintiff an opportunity to enter into a new agreement at the expiration date if GM determines that dealer has fulfilled its obligations under this agreement(s)." This provision, coupled with the fact that a franchise agreement is considered perpetual unless terminated pursuant to law, induced Plaintiff to reasonably rely upon GM's representation that there were no plans on the part of GM to discontinue the Oldsmobile line-make and that Plaintiff's substantial investments in furtherance of the sale of Oldsmobiles would be justified and would result in a reasonable return.

15.    The Sales and Service Agreement provides that GM is obligated to "permit each dealer [including Plaintiff] the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Sales and Service Agreement." (**Exhibit B**, Article 4.1). GM has consolidated its dealer network and eliminated inter-brand competition at the expense of all Oldsmobile dealers and Plaintiff in particular. Plaintiff's array of marketable models has been substantially reduced to the point where the Oldsmobile line of vehicles are virtually unmarketable, particularly in comparison to other GM line-makes with which the Plaintiff is similarly situated. Plaintiff's available array of models have been so substantially reduced that Plaintiff has no chance of fulfilling its responsibilities within its designated Area of Primary Responsibility, and GM has

5

voluntarily and deliberately decimated Plaintiff's Oldsmobile franchise. Moreover, by choosing Oldsmobile franchises for elimination to the exclusion of other GM Brands, GM has consciously and deliberately instituted a discriminatory system of motor vehicle distribution and has terminated the Plaintiff's Oldsmobile franchise.

16.     GM has engaged in a course of conduct, justifiably relied upon by Plaintiff, which engendered the reasonable belief that GM would provide automobile products to Plaintiff for sale to the public in accordance with GM's continuing commitment to contract renewals. Instead, through its conduct and statements to Plaintiff and other similarly situated Oldsmobile dealers, emphatically renounced these franchises and has announced that it has no intention of honoring its obligations, including the right of renewal, under the Sales and Service Agreement.

17.     Based upon Plaintiff's good faith reliance and belief in GM's commitment to continue to provide automobile products in accordance with its contractual commitments and, based upon GM's urging in conjunction with GM's written assurances of contract renewals for its Oldsmobile franchise, Plaintiff took the business measures described herein. Further Plaintiff's actions and investments were coerced by GM's insistence that such actions be taken in order to receive certain stipends, authorizations, incentives, benefits and the like from GM.

18.     By publication to GM Oldsmobile Dealers dated December 14, 2000, GM announced the existence of a "Transition Financial Assistance Program" for Oldsmobile dealers ("TFAP"). TFAP employs a GM compensation formula which unfairly values the loss to GM Dealers assigned to sell the Oldsmobile Brand as a result of GM's decision to discontinue Oldsmobile. Under TFAP, GM extends a value to the franchise which is but a fraction of the market value of a viable GM franchise on the open market. Once an Oldsmobile dealer elects to accept the TFAP Program offer from GM, the subject Oldsmobile franchise is promptly terminated by agreement between GM and

6

the affected Oldsmobile franchisee.

19.     GM misled all Oldsmobile dealers, including Plaintiff, by representing that TFAP was superior in compensation to GM's "contractual obligations" and "state law." GM's statement was false and made in bad faith to induce Oldsmobile dealers, including Plaintiff, to accept the TFAP payment and thereby waive all rights to seek other remedies which provide compensation for the true value of an Oldsmobile franchise. If the TFAP offer is not promptly accepted by an Oldsmobile franchisee then it is withdrawn by GM and the subject dealer takes nothing for the loss of the Oldsmobile franchise.

20.     Sometime after instituting the TFAP Program, GM added a component to the program which allegedly compensated the Oldsmobile dealers for "special circumstances." GM has refused to honor Plaintiff's request for a replacement GM line-make, but has honored similar assistance requests from other affected Oldsmobile dealers. If Plaintiff does not now bring suit for the termination and deliberate decimation of its Oldsmobile franchise, Plaintiff will not be compensated by GM for this substantial loss of a family operated business which has existed for over 75 years.

21.     Only one month prior to the announced termination of the Oldsmobile line-make, GM notified all GM Dealers assigned to sell the Oldsmobile Brand that they would be required to execute a revised GM Dealer Agreement. Plaintiff was among the GM Dealers to whom such notification was given. GM made no mention at that time of its plans to eliminate the Oldsmobile Brand. Plaintiff executed the revised GM Dealer Agreement knowing nothing of GM's plans.

22.     GM controls all research and development, design, manufacturing, price, incentives, and marketing of its line-make of new motor vehicles. GM decides which models, model types, model variations, and the like which are allocated for sale to Oldsmobile dealers.

7

23.     GM determines the product line and the manner in which such new motor vehicle product line will be distributed among its network of dealers. GM also determines which line-make of motor vehicles will be discontinued and terminated as part of a GM modification of its dealer network.

24.     GM exercises unique and unilateral power over its line-make of motor vehicles. GM determines the allocation of intellectual and financial resources to any given line-make which results in the design, dependability, value, price, models offered, ultimate appeal, and marketability of such line-make.

25.     GM has not abandoned or withdrawn from the market for automobile sales which the Oldsmobile Brand was designed to accommodate. Instead, GM has eliminated existing Oldsmobile models and has transferred Oldsmobile designs, chassis, drive trains, and research and development funding, which should have been allocated to Oldsmobile, to other GM Brands that GM has decided to enhance and continue. GM's conduct with respect to Oldsmobile amounts to open discrimination against Plaintiff and all Oldsmobile dealers similarly situated. GM has singled out the Oldsmobile Brand and Oldsmobile dealers for elimination even though such Oldsmobile dealers share equal contractual rights with other GM dealers. The dismantling of the Oldsmobile Brand has resulted in the present elimination of many Oldsmobile franchises across the United States which existed only months ago.

26.     GM's December 12, 2000, announcement, **Exhibit A**, and its October 27, 2004 letter, constitute a breach of Plaintiff's Sales and Service Agreement and a notice of intent to terminate, discontinue, or not renew Plaintiff's Sales and Service Agreement. GM's course of conduct further constitutes the intentional termination in fact or de facto termination of Plaintiff's Oldsmobile franchise.

8

27.    GM's December 12, 2000, announcement and the October 27, 2004 letter and their effect on Plaintiff's Sales and Service Agreement are governed by the terms and provisions of Massachusetts law. More importantly, the discretion to act arbitrarily that GM claims by contract has been eliminated by the requirements of Massachusetts law. The GM Sales and Service Agreement is modified by operation of law when a particular right to act in favor of GM is governed and limited by the application of Massachusetts law. GM's Sales and Service Agreement acknowledges the modification and literal amendment of its Sales and Service Agreement by operation of state law in Article 17.12 of its Standard Provisions, which provides in part that "[I]f performance under this Agreement is illegal under a valid law ... performance will be modified to the minimum extent necessary to comply with such law...." *See* Ex. C, Art. 17.12 at 29.

28.    GM's termination of Plaintiff's Oldsmobile franchise is not permitted by Massachusetts law or GM's own Sales and Service Agreement. Further, GM's actions are not undertaken in good faith and are not undertaken for good cause. GM's notice of intent to terminate and discontinue and its *de facto* termination of Plaintiff's franchise is not based on a material and substantial breach of the Sales and Service Agreement by Plaintiff, as required by MGL ch. 93B, § 5(h) and contract.

29.    GM has imposed and enforced contractual conditions agreed to by Plaintiff before GM's December 12, 2000, announcement, such as net working capital requirements and the like, which GM knows to be unreasonable in light of GM's decision to terminate its Oldsmobile brand. Moreover, GM has imposed an Area of Primary Responsibility (essentially a dealer's assigned sales and service area) upon Plaintiff which Plaintiff cannot possibly satisfy because of GM's systematic elimination of a viable product line for the Oldsmobile Brand.

30.    Plaintiff does not now seek to enjoin the termination of its franchise as the destruction

9

of Oldsmobile has been in progress for some time and is now effectively complete as evidenced by paltry Oldsmobile sales nationwide. The last Oldsmobile-branded vehicle was produced in April 2004 and no further production is planned for the Oldsmobile line-make. Plaintiff seeks damages in compensation for the losses GM has created in the wake of this deliberate demolition of the Oldsmobile brand.

## COUNT I

### Violations of Massachusetts General Laws Chapter 93B

31.    Plaintiff realleges paragraphs 1 through 30 as if fully set forth herein.

32.    This is an action for damages based upon violation of Massachusetts General Laws chapter 93B § 3, engaging in unfair methods of competition and unfair or deceptive acts or practices by terminating, cancelling, and not renewing Plaintiff's franchise without good cause, in bad faith or in an arbitrary or unconscionable manner in violation of chapter 93B § 5(a) for the reasons and actions described above.

33.    On October 27, 2004, GM provided written notice of its intent to terminate, discontinue, and not renew the Plaintiff's Oldsmobile franchise based upon the Defendant's determination to discontinue the Oldsmobile line-make. The Notice of Termination is in violation of MGL ch. 93B, § 5 as well as other applicable provisions of MGL ch. 93B, including, but not limited to the following:

(a)    GM has violated MGL ch. 93B, §5 in that GM has, by statements, conduct, and actions noticed its intent to discontinue, cancel, and not renew Plaintiff's Sales and Service Agreement and has caused the termination of Plaintiff's Oldsmobile franchise without good cause as required and defined by Massachusetts law;

(b)    GM has violated MGL ch. 93B, § 4(c)(1) in that GM has manipulated the system of

motor vehicle allocation or distribution or has implemented a system of allocation or distribution of motor vehicles to one or more of its franchise motor vehicle dealers (Plaintiff and Oldsmobile dealers similarly situated) which is arbitrary, unfair, and unreasonable. GM has violated this section by its elimination of Oldsmobile models, by its transfer of Oldsmobile models to other GM Brands, by cessation of the research and development of Oldsmobile models, all in open discrimination against Oldsmobile dealers and Plaintiff. This action has been undertaken by GM simultaneous with its increased allocation of enhanced and varied models, model options and makes to GM's non-Oldsmobile dealers;

(c)     GM has violated MGL ch. 93B, §4(c)(4) by attempting to require Plaintiff to accept GM's TFAP offer under threats that this was the best offer available and that benefits would be withdrawn from the offer unless Plaintiff promptly accepted and executed the TFAP documents which provide for mutual releases and the termination of the Oldsmobile franchise;

(d)     GM has violated MGL ch. 93B, § 4(c)(11) by attempting to coerce Plaintiff into accepting GM's grossly undervalued TFAP offer and terminating its franchise by agreement under threat of losing the misrepresented and bad faith TFAP offer, thereby attempting to relieve GM of liability imposed by chapter 93B; and

(e)     GM has violated MGL ch. 93B, § 4(c)(9) by obtaining and utilizing Haskins's valued Oldsmobile customer lists for the benefit of GM and other GM brands without accounting for the benefit acquired therefrom and compensating Haskins;

(f)     GM has violated MGL ch. 93(B), § 5(a)(4) by modifying "in fact" Plaintiff's Oldsmobile franchise, by eliminating Plaintiff's right to renew the franchise, to receive a reasonable return on investment, by failing to provide a sufficient number of models by series to allow Plaintiff to meet its obligations under its Area of Primary Responsibility all of which act to the detriment of

the Plaintiff and affect its return on investment.

34.    At all times material hereto, Plaintiff has complied with all terms and conditions of the Sales and Service Agreement and is not in violation of any contractual provision which would permit GM to involuntarily terminate the Oldsmobile franchise under the termination provisions of the Sales and Service Agreement or under the franchise laws of the State of Massachusetts. Additionally, there is no administrative remedy available to Plaintiff which offers any relief to a franchised dealer whose franchise has been marked for termination and is actively being terminated by a manufacturer.

35.    As a direct and proximate result of the wrongful acts of GM, the Plaintiff has suffered substantial damages. Pursuant to MGL ch. 93B, § 15, the Plaintiff is entitled to bring this action for damages.

WHEREFORE, Plaintiff demands judgment against the Defendant GM for damages together with prejudgment interest, attorney's fees, court costs and for any further relief which this Court may deem just and appropriate. The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT II

### Breach of Contract

36.    Plaintiff realleges paragraphs 1 through 30 as if fully set forth herein.

37.    This is an action for damages based upon breach of contract.

38.    Since 1930, the Plaintiff has been authorized to sell and service Oldsmobile line-make motor vehicles. Since that time, the Sales and Service Agreement with GM has been continually renewed, in compliance with the terms of the agreement and Massachusetts General Laws chapter 93B, § 5. The most recent renewal of the contract was November 1, 2000, only a month prior to

Defendant's Phase-out announcement. A copy of the Sales and Service Agreement is attached hereto and incorporated by reference herein as Plaintiff's **Exhibit B**. Pursuant to the terms and conditions of the written Sales and Service Agreement GM was obligated to continue to comply with all provisions of the contract, including: (1) the obligation to provide a reasonable quantity and variety of products to permit Plaintiff to fulfill its obligations under its Area of Primary Responsibility through the five (5) year term of the Agreement; (2) the obligation to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfilled its obligations under the Agreement as set forth in Article 4.1; (3) the obligation to provide a supply of motor vehicles by series in reasonable quantities; and (4) the obligation to maintain the Sales and Service Agreement in full force and effect indefinitely in accordance with Massachusetts law unless terminated pursuant to the termination provisions of the Sales and Service Agreement or as allowable under Massachusetts law. Plaintiff has at all times material hereto complied in all respects with the terms and conditions of the Sales and Service Agreement and has fulfilled its obligations under such Agreement and otherwise has satisfied all conditions precedent to the bringing of this action.

39.    GM's October 2004 announcement constitutes a complete repudiation of GM's obligations under the renewal provisions of the Sales and Service Agreement and such repudiation not only constitutes a modification of said agreement, but also releases the Plaintiff from satisfying any condition related to such renewal. GM has systematically reduced and is now actively eliminating Oldsmobile's motor vehicle series, models, and makes and Oldsmobile dealers within the GM dealer network. GM has reconfigured its entire GM dealer network so as to accommodate the elimination of Oldsmobile dealers which has resulted in a new GM dealer network designed to eliminate the ability of Plaintiff to compete and to eliminate the Plaintiff's ability and contractual right to realize the opportunity to achieve a reasonable return on its investment. Finally, GM has

13

caused, by its elimination and dismantling of its Oldsmobile brand in the various manners and means described herein, the de facto termination and, by way of the October 2004 letter, the actual termination of Plaintiff's Sales and Service Agreement on grounds not authorized by the provisions of the Sales and Service Agreement in violation of Article 14.5 of its Standard Provisions.

40.     As a result of Defendant's failures set forth above, the Defendant is in breach of the Sales and Service Agreement executed by and between the Plaintiff and the Defendant. As a result of the breach, the Plaintiff has suffered substantial damages.

WHEREFORE, Plaintiff demands judgment against the Defendant GM for damages together with prejudgment interest, attorney's fees, court costs and for any further relief which this Court may deem just and appropriate. The Plaintiff demands a trial by jury of right issues triable as of right by jury.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing

41.     Plaintiff realleges paragraphs 1 through 30 as if fully set forth herein.

42.     This is an action for damages based upon breach of implied covenant of good faith and fair dealing.

43.     Based upon the contractual relationship between Plaintiff and GM, GM owed to Plaintiff a duty of good faith and fair dealing in the performance and enforcement of the Sales and Service Agreement and relationship between the parties.

44.     The duty of good faith and fair dealing required that GM refrain from taking action which would deprive the Plaintiff of the benefits to which it is entitled under the Sales and Service Agreement existing between the parties.

45.     GM breached its implied covenant of good faith and fair dealing towards the Plaintiff

14

by, among other things, exercising its discretion in a way which failed to ensure the distribution of new motor vehicles occurred in a fair and equitable manner; by failing to provide Plaintiff with a reasonable variety and quantity or mix of vehicles sufficient to permit Plaintiff to satisfy its obligations under its Area of Primary Responsibility; by implementing a system of allocation of motor vehicles to plaintiff which is unfair, inequitable, discriminatory and designed by operation to terminate Plaintiff's Oldsmobile franchise, by engineering the reconfiguration of its dealer network in such manner as to eliminate all Oldsmobile dealers and products and preventing Plaintiff from any possibility of realizing a reasonable return on its investment; by intentionally rendering itself incapable of renewing Plaintiff's Oldsmobile franchise; by failing to comply with the termination provisions of the Sales and Service Agreement; by seeking to terminate the Sales and Service Agreement upon grounds not authorized under the Agreement or under Massachusetts law; and by failing to apply the TFAP Program in a fair and uniform manner. Although the TFAP Program is not expressly set forth in the Sales and Service Agreement, GM has acted, operated, and applied the Buy-Out Program as a substitute compensation mechanism for and in lieu of Article 15 ("Termination Assistance") of the Sales and Service Agreement.

46.     GM was obligated, and failed, to exercise good faith discretion in the implementation, execution, or performance of each of the above express and standing obligations and rights under Plaintiff's Sales and Service Agreement.

47.     The acts of GM were committed wilfully and recklessly and were committed with the express desire and intention to result in an unjust benefit to GM and to the detriment and damage of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant GM for damages together with prejudgment interest, attorney's fees, court costs and for any other relief which this Court may

deem just and appropriate.

## COUNT IV

### Unjust Enrichment

48.     Plaintiff realleges paragraphs 1 through 30 as if fully set forth herein.

49.     This is an action for damages based upon Unjust Enrichment.

50.     The Plaintiff conferred multiple benefits upon GM by, among other things, continuing its Oldsmobile franchise every renewal period over the last 75 years, most particularly investing significant time and effort to improve the image of all GM products, and by generating substantial goodwill in the "General Motors" name. Because of Plaintiffs efforts over the last 75 years, GM will inherit most of Plaintiff's past customers through their purchase of other GM brands. All of the above have and will continue to benefit GM and produce income for GM long after the Plaintiff's Oldsmobile franchise is eliminated. All of the foregoing benefits fall outside the scope and requirements of the Plaintiff's Sales and Service Agreement.

51.     GM has specific knowledge of the benefits conferred by the Plaintiff and has voluntarily accepted and retained such benefits. GM is presently implementing institutional programs to capitalize on the goodwill created by Plaintiff. But for GM's misconduct which resulted in the inducement of the Plaintiff to continue and keep the Oldsmobile franchise and make significant  investment in the franchise, the Plaintiff would not have otherwise retained and perpetuated the franchise. Because of the wrongful conduct of GM, the Plaintiff now owns an asset which has no value, as there is simply no market for the sale of a franchise product which will no longer exist. Plaintiff's facility is worth far less with Oldsmobile terminated. These circumstances are such that it is inequitable for GM to retain the benefits conferred by the Plaintiff in this regard without paying the true value thereof to the Plaintiff.

52.   GM has been unjustly enriched at the expense of the Plaintiff, and the Plaintiff has suffered significant damages.

WHEREFORE, Plaintiff demands judgment against Defendant GM for damages together with prejudgment interest, attorney's fees, court costs and for any other relief which this Court may deem just and appropriate.

The Plaintiff demands a trial by jury of all issues triable as a right by jury.

## DEMAND FOR SETTLEMENT CONFERENCE

Pursuant to MGL chapter 93B, § 15(b), the Plaintiff has made a written demand for a settlement conference to Defendant General Motors Corporation. The settlement conference demand was served by notified mail prior to the filing of this action as so prescribed by Massachusetts law.

Respectfully submitted,

**MYERS & FULLER, P.A.**

**Robert F. MacDonald, Jr.** (Mass. Bar # 660124)
**Glenn Israel** (Mass. Bar # 565388)
**BERSTEIN, SHUR, SAWYER & NELSON, PA.**
100 Middle Street, West Tower
Portland, Maine 04104
Telephone (207) 774-1200
Facsimile (207) 774-1127

and

**Richard N. Sox, Jr.** (Fla. Bar #982156)
**W. Douglas Moody** (Fla. Bar #301779)
**MYERS & FULLER, P.A.**
2822 Remington Green Circle
Tallahassee, Florida 32308
Telephone (850) 878-6404
Facsimile   (850) 942-4869

## ATTORNEYS FOR PLAINTIFF

17

✎JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

LESLIE T HASKINS, INC., d/b/a HASKINS OLDSMOBILE
a Massachusetts corporation

**DEFENDANTS**

GENERAL MOTORS CORPORATION,
a Delaware corporation

**(b)** County of Residence of First Listed Plaintiff    Norfolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Berstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, West Tower
Portland, Maine 04104  (207) 774-1200

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff

(For Diversity Cases Only)                                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☒ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332

Brief description of cause:
termination of franchise

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
75,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):      JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___Leslie T Haskins, Inc., d/b/a Haskins Oldsmobile   v.  General___ Motors Corporation

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

- [ ]   I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [✓]   II.     195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.              for patent, trademark or copyright cases

- [ ]   III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

- [ ]   IV.    220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

- [ ]   V.     150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                        YES  [ ]        NO  [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?    YES  [ ]        NO  [✓]

                                        YES  [ ]        NO  [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                        YES  [ ]        NO  [ ]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                        YES  [ ]        NO  [✓]

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division  [ ]          Central Division  [ ]          Western Division  [ ]

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

         Eastern Division  [✓]          Central Division  [ ]          Western Division  [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                                        YES  [ ]        NO  [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Robert F. MacDonald of Berstein, Shur, Sawyer & Nelson, P.A.
ADDRESS   100 Middle Street, West Tower, Portland, Maine 04104
TELEPHONE NO.   (207) 774-1200

(CategoryForm.wpd - 2/15/05)

**GM General Motors**

## TO ALL GENERAL MOTORS DEALERS

DATE: Tuesday, December 12, 2000

Today, General Motors is announcing a phase-out of the Oldsmobile Division and its products over the next several years. This was a particularly difficult and emotional decision for General Motors' leadership to make. Oldsmobile is this country's oldest car brand, with a history that goes back 103 years. It has one of the richest traditions in the industry, complete with many automotive industry firsts – and many legendary cars.

We are taking this action at this time because the industry is more competitive than ever. There is more new model competition than ever in all segments. The market has changed drastically in the past few months, and faster than anyone had anticipated, leaving more models competing for fewer customers.

Unfortunately, even with the very dedicated effort of Oldsmobile employees and dealers, and significant investments and management attention to the business, Oldsmobile has been unprofitable for some time.

GM has invested a considerable amount in engineering and capital to develop the current Alero, Intrigue, Aurora, Silhouette, and new Bravada. Yet, Oldsmobile has continued to lose market share and is still not profitable. We looked at opportunities for new products for Oldsmobile, including products we could develop with our alliance partners, but we could not find a profitable solution consistent with the overall General Motors' portfolio.

Accordingly, General Motors' management has decided not to make the considerable additional investment to continue to update and replace the current product lineup. This decision is difficult, but the management of GM feels strongly it is the right course of action in order to sustain and strengthen our competitive portfolio of brands.

The phase-out of Oldsmobile will enable us to focus our engineering, capital, marketing and advertising resources on a reduced portfolio of brands to improve competitiveness, profitability and growth.

GM's product portfolio is changing to more innovative entries and no longer assumes an exact replacement for any specific current model. We need to provide industry-leading products, targeted at specific segments that optimize our portfolio to produce profits for GM and its dealers.

GM plans to continue to produce and sell current Oldsmobile products until the end of their current model life cycles, or earlier if market demand falls below economic levels.

GM will work proactively with all Oldsmobile dealers and GM dealers for a smooth and orderly transition of existing franchises.



*Vehicle Sales, Service and Mark... ...aissance Center*
*Global Headqu... ...n 48265-1000*

**EXHIBIT**

**A**

A call center has been established in Detroit to address dealer questions and capture dealer concerns for resolution. The number is 1-866-221-1175. In addition, a transition team will be located at each of our regions to proactively address your concerns. This team will work on an individual basis with each of you. The team will develop an individual plan of action for your dealership.

GM will work with the Oldsmobile dealers to ensure Oldsmobile customers continue to receive quality service and parts. Oldsmobile will continue to operate over the next several years and we will provide the kind of service and marketing support that Oldsmobile customers have come to expect. However, if there is any change in Oldsmobile representation in an owner's area, service and parts for these Oldsmobile customers will continue to be available.

There will be additional customer care initiatives, such as offering Oldsmobile customers who purchased or leased a new Oldsmobile model year 1996 or later, a $1,500 certificate toward the purchase or lease of a new Oldsmobile or $1,000 toward the purchase or lease of another General Motors vehicle. GM and Oldsmobile dealers will be in contact with Oldsmobile customers to assure them of GM's continued support of Oldsmobile products and thank them for their loyalty to GM dealers and GM products. Certain restrictions apply. Details of these programs will be provided in dealer and customer communications.

If your customers have any concerns or questions, a special 1-800 number has been set up specifically for them (866-306-6030).

The dedication and loyalty exhibited by Oldsmobile employees and dealers over the years, particularly the past five years, has been exemplary. General Motors is fortunate to have such a dedicated group of professionals.

Again, this has been a difficult and agonizing decision for us to make.

We are committed to working with each of the affected dealers during this transition.

W.J. Lovejoy

GMMS 1012
USA 11/2000

847    4701
BAC: 116877

# GENERAL MOTORS CORPORATION
## Dealer Sales And Service Agreement(s)

Effective _____ NOVEMBER 1, 2000 _____, General Motors Corporation, a Delaware Corporation, separately on behalf of its Division(s) identified in the specific Motor Vehicle Addendum(s) for ☐ Chevrolet Motor Division, ☐ Pontiac-GMC Division (Pontiac Motor Vehicles), ☐ Pontiac-GMC Division (GMC Motor Vehicles), ☑ Oldsmobile Division, ☐ Buick Motor Division, and ☐ Cadillac Motor Car Division ("General Motors") and _____ LESLIE T. HASKINS, INC _____.
☐ a proprietorship, ☐ a partnership, or ☑ a _____ MASSACHUSETTS _____ corporation, ☐ a limited liability company, or ☐ other business entity _____, doing business at
_____ 467-469 WASHINGTON STREET, WELLESLEY, MASSACHUSETTS, 02181 _____ ("Dealer"),
hereby enter into separate Agreement(s) for each Motor Vehicle Line-Make(s) included in the Motor Vehicle Addendum(s) incorporated into this Agreement, and only for the Line-Make(s) included in the Motor Vehicle Addendum(s). The Agreement for each Line-Make is independent and separately enforceable by each party, and the use of this common form is intended solely to simplify execution of the Agreement(s). The parties agree as follows:

## FIRST: TERM OF AGREEMENT(S)

This Agreement(s) shall expire on _____ OCTOBER 31, 2005 _____ or ninety days after the death or incapacity of a Dealer Operator, whichever occurs first, unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

## SECOND: STANDARD PROVISIONS AND RELATED ADDENDA

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

## THIRD: DEALER OPERATOR AND DEALER OWNER

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions. DOUGLAS
ALVAN L. HASKINS                                    E. HASKINS
The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
N/A

## FOURTH: EXECUTION OF AGREEMENT(S) AND RELATED DOCUMENT(S)

This Agreement(s) and related agreement(s) are valid only if signed:
    (a) on behalf of Dealer by its duly authorized representative, and in the case of this Agreement(s), by its Dealer Operator; and
    (b) this Agreement(s) as set forth below on behalf of General Motors by the Regional General Manager and his authorized representative. All related agreements will be signed by the Regional General Manager or his authorized representative.

## FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS

The following agreement(s) are hereby incorporated by reference into this Agreement(s):

_____    _____
_____    _____

LESLIE T. HASKINS, INC                        **GENERAL MOTORS CORPORATION**
Dealer Firm Name

By: _____        By: _____
Dealer Operator and Date                  Regional General Manager

                                          By: _____
                                          Authorized Representative and Date

EXHIBIT
B

GMMS 1012
USA 11/2000

# GENERAL MOTORS CORPORATION
## Dealer Sales And Service Agreement(s)

Effective __JANUARY 07, 2002__, General Motors Corporation, a Delaware Corporation, separately on behalf of its Division(s) identified in the specific Motor Vehicle Addendum(s) for ☐ Chevrolet Motor Division, ☐ Pontiac–GMC Division (Pontiac vehicles), ☐ Pontiac–GMC Division (GMC vehicles), ☒ Oldsmobile Division, ☐ Buick Motor Division, and ☐ Cadillac Motor Car Division ("General Motors") and __LESLIE T. HASKINS, INC.__, ☐ a proprietorship, ☐ a partnership, or ☒ a __MASSACHUSETTS__ corporation, ☐ a limited liability company, or ☐ other business entity ____, doing business at __467–469 WASHINGTON ST, WELLESLEY, MASSACHUSETTS 02482__, ("Dealer"), hereby enter into separate Agreement(s) for each Motor Vehicle Line–Make(s) included in the Motor Vehicle Addendum(s) incorporated into this Agreement, and only for the Line–Make(s) included in the Motor Vehicle Addendum(s). The Agreement for each Line–Make is independent and separately enforceable by each party, and the use of this common form is intended solely to simplify execution of the Agreement(s). The parties agree as follows:

## FIRST: TERM OF AGREEMENT(S)

This Agreement(s) shall expire on __OCTOBER 31, 2005__ or ninety days after the death or incapacity of a Dealer Operator, whichever occurs first, unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

## SECOND: STANDARD PROVISIONS AND RELATED ADDENDA

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

## THIRD: DEALER OPERATOR AND DEALER OWNER

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions:
__ALYAN L. HASKINS__

The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
__N/A__

## FOURTH: EXECUTION OF AGREEMENT(S) AND RELATED DOCUMENT(S)

This Agreement(s) and related agreement(s) are valid only if signed:

   (a)   on behalf of Dealer by its duly authorized representative, and in the case of this Agreement(s), by its Dealer Operator; and

   (b)   this Agreement(s) as set forth below on behalf of General Motors by the Regional General Manager and his authorized representative. All related agreements will be signed by the Regional General Manager or his authorized representative.

## FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS

The following agreement(s) are hereby incorporated by reference into this Agreement(s):


__LESLIE T. HASKINS, INC__
Dealer Firm Name

By: X _____
Dealer Operator and Date


**GENERAL MOTORS CORPORATION**

By: _____
Regional General Manager

By: X _____  1-07-02
Authorized Representative and Date

GMMS 1031
USA  11-90

# NOTICE OF AREA OF PRIMARY RESPONSIBILITY
# TO GENERAL MOTORS CORPORATION

## Dealer Sales and Service Agreement

Effective _____ Dec. 31, 2002 _____ , the area described below and known as BOSTON, MA
shall be the Dealer's Area of Primary Responsibility for the undersigned division of
General Motors.

The portion of ESSEX county, MASSACHUSETTS defined by the following U.S. Census Tract(s).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2011.00 | 2021.00 | 2022.00 | 2031.00 | 2032.00 | 2033.00 | 2041.01 | 2041.02 |
| 2042.00 | 2043.00 | 2044.00 | 2045.00 | 2046.00 | 2047.01 | 2047.02 | 2051.00 |
| 2052.00 | 2053.00 | 2054.00 | 2055.00 | 2056.00 | 2057.00 | 2058.00 | 2059.00 |
| 2060.00 | 2061.00 | 2062.00 | 2063.00 | 2064.00 | 2065.00 | 2066.00 | 2067.00 |
| 2068.00 | 2069.00 | 2070.00 | 2071.00 | 2072.00 | 2081.01 | 2081.02 | 2082.00 |
| 2083.00 | 2084.00 | 2091.00 | 2092.00 | 2101.00 | 2102.00 | 2103.00 | 2104.00 |
| 2105.00 | 2106.00 | 2107.00 | 2108.00 | 2109.00 | 2111.00 | 2112.00 | 2113.00 |
| 2114.00 | 2121.00 | 2161.00 | 2171.00 | 2172.01 | 2172.02 | 2173.00 | 2174.00 |
| 2175.00 | 2176.00 | 2532.04 | 2543.01 | 2543.02 | 2544.03 | | |

All of MIDDLESEX county, MASSACHUSETTS except the following U.S. Census Tract(s).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3001.00 | 3011.01 | 3011.02 | 3021.00 | 3022.00 | 3101.00 | 3102.00 | 3103.00 |
| 3104.00 | 3105.00 | 3106.01 | 3106.02 | 3107.00 | 3108.00 | 3110.00 | 3111.00 |
| 3112.00 | 3113.00 | 3114.00 | 3115.00 | 3116.00 | 3117.00 | 3118.00 | 3119.00 |
| 3120.00 | 3121.00 | 3122.00 | 3123.00 | 3124.00 | 3125.01 | 3125.02 | 3131.01 |
| 3131.02 | 3141.01 | 3141.02 | 3142.00 | 3143.01 | 3143.02 | 3151.00 | 3171.01 |
| 3171.02 | 3171.03 | 3172.01 | 3172.02 | 3172.03 | 3173.00 | 3181.00 | 3182.00 |
| 3183.00 | 3184.00 | 3201.02 | 3211.00 | 3212.00 | 3213.00 | 3214.00 | 3215.00 |
| 3216.00 | 3221.00 | 3222.00 | 3223.00 | 3224.00 | 3231.00 | 3241.00 | 3251.00 |
| 3261.00 | 3271.01 | 3271.02 | 3271.03 | 3281.00 | 3611.00 | 3612.00 | 3631.01 |
| 3631.02 | 3632.01 | 3632.02 | 3641.01 | 3641.02 | 3651.00 | 3652.01 | 3881.00 |

All of NORFOLK county, MASSACHUSETTS except the following U.S. Census Tract(s).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4071.00 | 4081.01 | 4081.02 | 4091.01 | 4091.02 | 4101.00 | 4103.00 | 4142.00 |
| 4211.00 | 4401.00 | 4412.01 | 4412.02 | 4421.01 | 4421.02 | 4421.03 | 4422.00 |
| 4431.01 | 4431.02 | 4561.01 | 4561.02 | 4562.00 | 4564.02 | 4571.00 | |

The portion of PLYMOUTH county, MASSACHUSETTS defined by the following U.S. Census Tract(s).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5001.01 | 5001.02 | 5011.01 | 5011.02 | 5012.01 | 5012.02 | 5021.01 | 5022.00 |
| 5031.01 | 5031.02 | 5041.01 | 5041.02 | 5051.01 | 5051.02 | 5052.00 | 5202.01 |

All of SUFFOLK county, MASSACHUSETTS.

The portion of WORCESTER county, MASSACHUSETTS defined by the following U.S. Census Tract(s).

7441.01

00000116877-O

[Continued on following page(s)]

Page   1   of    2

Geog Ref: P-BASE2000CT

GMMS 1006
USA 11/2000

# SUCCESSOR ADDENDUM
## TO
## GENERAL MOTORS CORPORATION
### Dealer Sales and Service Agreement

This Successor Addendum is effective JANUARY 07, 2002, and is executed pursuant to the provisions of Article 12.1 of the current Dealer Agreement in effect between the undersigned Dealer and General Motors.

In reliance on the accuracy of the information provided by Dealer, in connection with the Request for Execution of Successor Addendum, General Motors and Dealer agree that:

1.  Subject to paragraph 2 below, the proposed dealer operator(s) for purposes of designating and establishing a proposed successor dealer as provided in Article 12.1 of the Dealer Agreement shall be: ROBERT W. HASKINS

2.  If more than one proposed dealer operator is named in 1 above, the proposed dealer operator shall be considered in preferred order from the names listed above as indicated by the boxes.

3.  This addendum shall become null and void upon the execution of a new Dealer Agreement by Dealer and General Motors.

4.  This Successor Addendum cancels and supersedes any previous Successor Addendum between the parties.

LESLIE T. HASKINS, INC
Dealer Firm Name

WELLESLEY, MASSACHUSETTS
City, State

GENERAL MOTORS CORPORATION

By _____  1·07·02          By: X _____  1·07·02
Dealer Operator            Date                  Authorized Representative       Date

GMMS 1013
11-00 USA

# Standard Provisions

## Dealer
## Sales and Service
## Agreement

## GENERAL MOTORS CORPORATION

# Table of Contents

URPOSE OF AGREEMENT ................................................................ 1

RTICLE 1.  APPOINTMENT AS AUTHORIZED DEALER ................ 1

RTICLE 2.  DEALER OPERATOR .................................................... 2

RTICLE 3.  DEALER OWNER .......................................................... 2

RTICLE 4.  AUTHORIZED LOCATIONS ......................................... 2
.1     Dealer Network Planning ...................................................... 2
.2     Area of Primary Responsibility ............................................ 3
.3     Establishment of Additional Dealers ................................... 3
.4     Facilities ............................................................................... 3
         4.4.1      Location ............................................................ 3
         4.4.2      Change in Location or Use of Premises ........... 4
         4.4.3      Size ................................................................... 4
         4.4.4      Dealership Image and Design ........................... 4
         4.4.5      Dealership Equipment ...................................... 5

RTICLE 5.  DEALER'S RESPONSIBILITY TO PROMOTE,
SELL, AND SERVICE PRODUCTS ................................................... 5
5.1     Responsibility to Promote and Sell ...................................... 5
5.2     Responsibility to Service ...................................................... 6
5.3     Customer Satisfaction .......................................................... 7
5.4     Business Planning ................................................................ 7
5.5     Dealer Council ..................................................................... 7
5.6     Electronic Communications, Data Interchange, and Electronic
         Transactions ......................................................................... 8

ARTICLE 6.  SALE OF PRODUCTS TO DEALERS ........................... 8
6.1     Sale of Motor Vehicles to Dealer ......................................... 8
6.2     Sale of Parts and Accessories to Dealer ............................... 9
6.3     Prices and Other Terms of Sale ............................................ 9
         6.3.1      Motor Vehicles ................................................. 9
         6.3.2      Parts and Accessories ....................................... 9
6.4     Inventory ............................................................................. 9
         6.4.1      Motor Vehicle Inventory .................................. 9
         6.4.2      Parts and Accessories ....................................... 9
6.5     Warranties on Products ........................................................ 10

ARTICLE 7.  SERVICE OF PRODUCTS ............................................ 10
7.1     Service for Which General Motors Pays ............................... 10
         7.1.1      New Motor Vehicle Pre-Delivery Inspections
                      and Adjustments ............................................... 10
         7.1.2      Warranty and Special Policy Repairs ............... 10
         7.1.3      Campaign Inspections and Corrections ............ 10
         7.1.4      Payment for Pre-Delivery Adjustments, Warranty,
                      Campaign and Transportation Damage Work .... 11
7.2     Parts, Accessories and Body Repairs .................................... 11
         7.2.1      Warranty and Policy Repairs ............................ 11
         7.2.2      Representations and Disclosures as to Parts and
                      Accessories ....................................................... 11
         7.2.3      Body Repairs .................................................... 11
         7.2.4      Tools and Equipment ........................................ 11

ARTICLE 8.  TRAINING .................................................................... 12

ARTICLE 9.  REVIEW OF DEALER'S SALES PERFORMANCE ............... 12

ARTICLE 10.  CAPITALIZATION ...................................................... 13
10.1    Net Working Capital ............................................................ 13
10.2    Wholesale Floorplan ............................................................ 13

ARTICLE 11.  ACCOUNTS AND RECORDS ...................................... 13
11.1    Uniform Accounting System ................................................ 13
11.2    Application for Payment ....................................................... 13
11.3    Examination of Accounts and Records ................................. 14
11.4    Confidentiality of Dealer Data ............................................. 14

ARTICLE 12.  CHANGES IN MANAGEMENT AND OWNERSHIP ............. 14
12.1    Succession Rights Upon Death or Incapacity ...................... 14
         12.1.1    Successor Addendum ........................................ 14
         12.1.2    Absence of Successor Addendum ...................... 14
         12.1.3    Successor Dealer Requirements ........................ 15
         12.1.4    Term of New Dealer Agreement ....................... 15
         12.1.5    Limitation on Offers ......................................... 15
         12.1.6    Cancellation of Addendum ............................... 15
12.2    Other Changes in Ownership or Management ....................... 15
12.3    Right of First Refusal to Purchase ....................................... 16
         12.3.1    Creation and Coverage .................................... 16
         12.3.2    Purchase Price and Other Terms of Sale .......... 17
                      (a) Bona Fide Agreement ................................. 17
                      (b) Absence of a Bona Fide Agreement ............ 17
         12.3.3    Consummation .................................................. 17
         12.3.4    Assignment ....................................................... 17
         12.3.5    Transfer Involving Family Members and Dealer
                      Management ...................................................... 17
         12.3.6    Expenses .......................................................... 18

ARTICLE 13.  BREACHES AND OPPORTUNITY TO REMEDY ............... 18
13.1    Certain Acts or Events ......................................................... 18
13.2    Failure of Performance by Dealer ........................................ 19

ARTICLE 14.  TERMINATION OF AGREEMENT ............................. 20
14.1    By Dealer .............................................................................. 20
14.2    By Agreement ....................................................................... 20
14.3    Failure to be Licensed .......................................................... 20
14.4    Incapacity of Dealer Operator .............................................. 20
14.5    Acts or Events ...................................................................... 20
14.6    Reliance on Any Applicable Termination Provision .............. 21
14.7    Transactions After Termination ............................................ 21
         14.7.1    Effect on Orders ............................................... 21
         14.7.2    Termination Deliveries ..................................... 21
         14.7.3    Effect of Transactions After Termination ......... 22

ARTICLE 15.  TERMINATION ASSISTANCE ................................... 22
15.1    Deferral of Effective Date .................................................... 22
15.2    Purchase of Personal Property ............................................. 22
         15.2.1    General Motors Obligations .............................. 22
         15.2.2    Dealer's Responsibilities .................................. 23
         15.2.3    Payment ........................................................... 23
         15.2.4    Replacement Dealer ......................................... 23
15.3    Assistance on Premises ........................................................ 24
         15.3.1    General Motors Obligation ............................... 24
         15.3.2    Owned Premises ............................................... 24
         15.3.3    Leased Premises ............................................... 24
         15.3.4    Rent and Price .................................................. 25
         15.3.5    Limitations on Obligation to Provide Assistance ............. 25

ARTICLE 16.  DISPUTE RESOLUTION PROCESS ........................... 25

ARTICLE 17.  GENERAL PROVISIONS ........................................... 26
17.1    No Agent or Legal Representative Status .............................. 26
17.2    Responsibility for Operations .............................................. 26
17.3    Taxes .................................................................................... 26
17.4    Indemnification by General Motors ..................................... 26
17.5    Trademarks and Service Marks ............................................ 27
17.6    Notices ................................................................................. 28
17.7    No Implied Waivers ............................................................. 28
17.8    Assignment of Rights or Delegation of Duties ..................... 28
17.9    No Third Party Benefit Intended .......................................... 28
17.10   Accounts Payable ................................................................ 28
17.11   Sole Agreement of Parties ................................................... 28
17.12   Applicable Law Agreement .................................................. 29
17.13   Superseding Dealer Agreements .......................................... 29

GLOSSARY ...................................................................................... 30

# Standard Provisions

The following Standard Provisions are part of General Motors Dealer Sales and Service Agreement(s) (Form GMMS 1012).

## PURPOSE OF AGREEMENT

The purpose of this Agreement is to promote a relationship between General Motors and its Dealers which encourages and facilitates cooperation and mutual effort to satisfy customers, and permits General Motors and its dealers to fully realize their opportunities for business success. General Motors has established a network of authorized dealers operating at approved locations to effectively sell and service its Products and to build and maintain consumer confidence and satisfaction in Dealer and General Motors. Consequently, General Motors relies upon each Dealer to provide appropriate skill, capital, equipment, staff and facilities to properly sell, service, protect the reputation, and satisfy the customers of General Motors Products in a manner that demonstrates a caring attitude toward those customers. At the same time, Dealer relies upon General Motors to provide sales and service support and to continually strive to enhance the quality and competitiveness of its Products. This mutual dependence requires a spirit of cooperation, trust and confidence between General Motors and its dealers. To facilitate attainment of cooperation, trust and confidence, and to provide General Motors with the benefit of dealer advice regarding many decisions which affect dealer business operations, General Motors has established mechanisms to obtain dealer input in the decision making process.

This Agreement (i) authorizes Dealer to sell and service General Motors Products and represent itself as a General Motors Dealer; (ii) states the terms under which Dealer and General Motors agree to do business together; (iii) states the responsibilities of Dealer and General Motors to each other and to customers; and (iv) reflects the mutual dependence of the parties in achieving their business objectives.

# ARTICLE 1. APPOINTMENT AS AUTHORIZED DEALER

General Motors appoints Dealer as a non-exclusive dealer of General Motors Products. Dealer has the right to buy Products and the obligation to market and service those Products in accordance with this Agreement and related documents.

# ARTICLE 2.  DEALER OPERATOR

This is a Personal Services Agreement, entered into in reliance on the qualifications, integrity and reputation of Dealer Operator identified in Paragraph Third, and on Dealer's assurance that Dealer Operator will provide personal services by exercising full managerial authority over Dealership Operations. Dealer Operator will have an unencumbered ownership interest in Dealer of at least 15 percent at all times. A Dealer Operator must be a competent business person, an effective manager, must have demonstrated a caring attitude toward customers, and should have a successful record as a merchandiser of automotive products and services or otherwise have demonstrated the ability to manage a dealership. The experience necessary may vary with the potential represented by each dealer location. Although this Agreement is entered into in reliance on the personal services of the Dealer Operator, the Dealer entity specified in this Agreement is the only party to this Agreement with General Motors.

# ARTICLE 3.  DEALER OWNER

General Motors enters into this Agreement in reliance on the qualifications, integrity and reputation of dealer owner(s) identified in the Dealer Statement of Ownership. General Motors and Dealer agree each dealer owner will continue to own, both of record and beneficially, the percentage stated in the Dealer Statement of Ownership, unless a change is made in accordance with Article 12.

# ARTICLE 4.  AUTHORIZED LOCATIONS

## 4.1    Dealer Network Planning

Because General Motors distributes its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement. Through such a dealer network, General Motors can maximize the convenience of customers in purchasing Products and having them serviced. As a result, customers, dealers, and General Motors all benefit.

To maximize the effectiveness of its dealer network, General Motors agrees to monitor marketing conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above. Such marketing conditions include General Motors sales and registration performance, present and future demographic and economic considerations, competitive dealer networks, the

2

ability of General Motors existing dealers to achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, General Motors dealer network plan, and other appropriate circumstances.

## 4.2    Area of Primary Responsibility

Dealer is responsible for effectively selling, servicing and otherwise representing General Motors Products in the Area designated in a Notice of Area of Primary Responsibility. General Motors retains the right to revise Dealer's Area of Primary Responsibility at General Motors sole discretion consistent with dealer network planning objectives. If General Motors determines that marketing conditions warrant a change in Dealer's Area of Primary Responsibility, it will advise Dealer in writing of the proposed change, the reasons for it, and will consider any information the Dealer submits. Dealer must submit such information in writing within 30 days of receipt of notice of the proposed change. If General Motors thereafter decides the change is warranted, it will issue a revised Notice of Area of Primary Responsibility.

## 4.3    Establishment of Additional Dealers

General Motors reserves the right to appoint additional dealers but General Motors will not exercise this right without first analyzing dealer network planning considerations with respect to the Line-Make under consideration. Prior to establishing an additional same Line-Make dealer within Dealer's Area of Primary Responsibility, General Motors will advise Dealer in writing and give Dealer thirty days

to present relevant information before General Motors makes a final decision. If requested by Dealer within the thirty days, General Motors will extend the time for an additional thirty days if reasonably necessary for Dealer to obtain and submit relevant information. General Motors will advise Dealer of the final decision concerning the establishment of an additional dealer, which will be made solely by General Motors pursuant to its business judgment. Nothing in this Agreement is intended to require Dealer's consent to the establishment of an additional dealer, nor is this Agreement intended to give Dealer a right to object to the establishment of a different Line-Make.

Neither the appointment of a dealer at or within three miles of a former dealership location as a replacement for the former dealer nor the relocation of an existing dealer point will be considered the establishment of an additional Dealer for purposes of this Article 4.3. Such events are within the sole discretion of General Motors pursuant to its business judgment.

## 4.4    Facilities

### 4.4.1    Location

Dealer agrees to conduct Dealership Operations only from the approved location(s) within its Area of Primary Responsibility. The Location and Premises Addendum identifies Dealer's approved location(s) and facilities ("Premises"). If more than one location is approved, Dealer agrees to conduct from each location only those Dealership Operations authorized in the Addendum for such location.

### 4.4.2 Change in Location or Use of Premises

If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without General Motors prior written authorization pursuant to its business judgment.

Before General Motors requires any changes in Premises, it will consult with Dealer, indicate the rationale for the change, and solicit Dealer's views on the proposal. If, after such review with Dealer, General Motors determines a change in Premises or location is appropriate, the Dealer will be allowed a reasonable time to implement the change. Any such changes will be reflected in a new Location and Premises Addendum or other written agreement executed by Dealer and General Motors.

Nothing herein is intended to require the consent or approval of any dealer to a proposed relocation of any other dealer.

### 4.4.3 Size

Dealer agrees to provide Premises at its approved location(s) that will promote the effective performance and conduct of Dealership Operations, and General Motors image and goodwill. Consistent with General Motors dealer network planning

objectives and General Motors interest in maintaining the stability and viability of its dealers, Dealer agrees that its facilities will be sized in accordance with General Motors requirements for that location.

General Motors agrees to establish and maintain a clearly stated policy for determining reasonable dealer facility space requirements and to periodically re-evaluate those requirements to ensure that they continue to be reasonable.

### 4.4.4 Dealership Image and Design

The appearance of Dealer's Premises is important to the image of Dealer and General Motors, and can affect the way customers perceive General Motors Products and its dealers generally. Dealer therefore agrees that its Premises will be properly equipped and maintained, and that the interior and exterior retail environment and signs will comply with any ~~reasonable requirements General Motors may~~ establish to promote and preserve the image of General Motors and its dealers.

General Motors will monitor developments in automotive and other retail industries to ensure that General Motors image and facility requirements are responsive to changes in the marketing environment.

General Motors will take into account existing economic and marketing conditions and consult with the appropriate dealer council in establishing such requirements.

4

#### 4.4.5 Dealership Equipment

Effective performance of Dealer's responsibilities under this Agreement requires that the dealership be reasonably equipped to communicate with customers and General Motors and to properly diagnose and service Products. Accordingly, Dealer agrees to provide for use in the Dealership Operations any equipment reasonably designated by General Motors as necessary for Dealer to perform effectively under this Agreement. General Motors will make such designations only after having consulted with the appropriate dealer council.

# ARTICLE 5. DEALER'S RESPONSIBILITY TO PROMOTE, SELL, AND SERVICE PRODUCTS

## 5.1    Responsibility to Promote and Sell

**5.1.1** Dealer agrees to effectively, ethically and lawfully sell and promote the purchase, lease and use of Products by consumers located in its Area of Primary Responsibility. To achieve this objective, Dealer agrees to:

(a) maintain an adequate staff of trained sales personnel;

(b) explain to Product purchasers the items which make up the purchase price and provide purchasers with itemized invoices;

(c) not charge customers for services for which Dealer is reimbursed by General Motors;

(d) include in customer orders only equipment or accessories requested by customer or required by law; and

(e) ensure that the customer's purchase and delivery experience are satisfactory.

If Dealer modifies or sells a modified new Motor Vehicle, or installs any equipment, accessory, recycled part or part not supplied by General Motors, or sells any non-General Motors service contract for a Motor Vehicle, Dealer will disclose this fact on the purchase order and bill of sale, indicating that the modification, equipment, accessory or part is not warranted by General Motors or, in the case of a service contract, the coverage is not provided by General Motors or an affiliate.

**5.1.2** Dealer located in the United States is authorized to sell new Motor Vehicles only to customers located in the United States. Dealer agrees that it will not sell new Motor Vehicles for resale or principal use outside the United States. Dealer also agrees not to sell any new Motor Vehicles which were not originally manufactured for sale and distribution in the United States. For this section, United States includes the fifty states and the District of Columbia.

**5.1.3** Dealer located in Puerto Rico or the US Virgin Islands is authorized to sell new Motor Vehicles only to customers located in Puerto Rico or the US Virgin Islands respectively. Dealer in Puerto Rico or the US Virgin Islands agrees that it will not

sell new Motor Vehicles to customers located outside Puerto Rico or the US Virgin Islands respectively, or to customers for resale or principal use outside of Puerto Rico or the US Virgin Islands. Dealer agrees not to sell any new Motor Vehicles which were not originally manufactured for sale and distribution in Puerto Rico or the US Virgin Islands respectively.

5.1.4    It is General Motors policy not to sell or allocate new Motor Vehicles to dealers for resale to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling Motor Vehicles. The dealer distribution organizations that General Motors has established in the United States, Puerto Rico and US Virgin Islands are best suited for the distribution of Motor Vehicles in the United States, Puerto Rico and the US Virgin Islands respectively, and are in the best position to arrange for the proper performance of Motor Vehicle warranty repairs, safety campaigns and inspections, pre-delivery inspections, and ongoing maintenance and compliance with government requirements. Therefore, unless otherwise authorized in writing by General Motors, Dealer agrees that this Agreement authorizes Dealer to purchase Motor Vehicles only for resale to customers for personal use or primary business use other than resale. Dealer is not authorized by this Agreement to directly or indirectly sell Motor Vehicles to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling of Motor Vehicles. Nothing in this Article 5.1.4 is intended to restrict Dealer from selling Motor Vehicles to other General Motors

dealers of the same Line-Make in the same country or territory.

5.1.5    General Motors will conduct general advertising programs to promote the sale of Products for the mutual benefit of General Motors and Dealers. General Motors will make available to Dealer advertising and sales promotion materials from time to time and advise Dealer of any requirements or applicable charges.

5.1.6    Dealer agrees to advertise and conduct promotional activities that are lawful and enhance the reputation of Dealer, General Motors and its Products. Dealer will not advertise or conduct promotional activities in a misleading or unethical manner, or that is harmful to the reputation of Dealer, General Motors, or its Products.

5.2    Responsibility to Service

5.2.1 Dealer agrees to maximize customer satisfaction by providing courteous, convenient, prompt, efficient and quality service to owners of Motor Vehicles, regardless of from whom the Vehicles were purchased. All service will be performed and administered in a professional manner and in accordance with all applicable laws and regulations, this Agreement, and the Service Policies and Procedures Manual, as amended from time to time.

5.2.2    Dealer agrees to maintain an adequate service and parts organization as recommended by General Motors, including a competent, trained service and parts manager(s),

trained service and parts personnel and, where service volume or other conditions make it advisable, a consumer relations manager.

**5.2.3**  Dealer and General Motors will each provide the other with such information and assistance as may reasonably be requested by the other to facilitate compliance with applicable laws, regulations, investigations and orders relating to Products.

**5.2.4**  To build and maintain consumer confidence in, and satisfaction with, Dealer and General Motors, Dealer will comply with General Motors procedures for the investigation and resolution of Product-related complaints.

**5.2.5**  General Motors will make available to Dealer current service and parts manuals, bulletins, and technical data publications relating to Motor Vehicles.

**5.3    Customer Satisfaction**

Dealer and General Motors recognize that appropriate care for the customer will promote customer satisfaction with General Motors Products and its dealers, which is critically important to our current and future business success. Dealer therefore agrees to conduct its operations in a manner which will promote customer satisfaction with the purchase and ownership experience. General Motors agrees to provide Dealer with reasonable support to assist Dealer's attainment of customer satisfaction.

General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's purchase and delivery customer satisfaction and Dealer's service customer satisfaction. The report will compare Dealer's performance to other same Line-Make dealers in the Region. General Motors will provide a written explanation of the customer satisfaction review process to Dealer.

General Motors may revise the customer satisfaction evaluation process from time to time. General Motors will consult with the appropriate dealer council before making any changes.

**5.4    Business Planning**

General Motors has established a business planning process to assist dealers. Dealer agrees to prepare and implement a reasonable business plan if requested by General Motors. General Motors agrees to provide Dealer with information specific to its dealership, and if requested, to assist Dealer in its business planning as agreed upon by Dealer and General Motors.

**5.5    Dealer Council**

General Motors agrees to establish such dealer councils as appropriate to foster and maintain a positive business relationship between General Motors and its dealers, and to obtain dealer input in General Motors decision-making process. These councils may be established on a national, regional or local basis, and General Motors will consult with dealers in establishing or changing such dealer councils. These councils are intended to provide General Motors with the benefit of dealer advice regarding various decisions which affect dealership operations.

7

### 5.6 Electronic Communications, Data Interchange, and Electronic Transactions

To provide for effective and efficient communication, data interchange and electronic transactions between General Motors, its dealers, and its customers, General Motors may establish reasonable requirements for Dealer's acquisition and use of certain computer software, computer hardware, and systems in Dealership Operations, including but not limited to use involving or relating to the Internet. General Motors will take into consideration factors such as market conditions, competitive circumstances, and costs in establishing such reasonable requirements. Dealer agrees to comply with those requirements and all restrictions and limitations applicable to such computer software, computer hardware or systems. General Motors will consult with the appropriate dealer council in establishing such requirements.

General Motors may provide Dealer from time to time certain customer information or other information or data. Dealer agrees to use such information or data only as designated by General Motors, and not to otherwise disclose such information or data without General Motors written permission, unless otherwise required by law. This restriction only applies to information and data provided by General Motors to its dealers, and does not apply to data or information Dealer obtains from its customers or other sources.

## ARTICLE 6.  SALE OF PRODUCTS TO DEALERS

### 6.1 Sale of Motor Vehicles to Dealer

General Motors will periodically furnish Dealer one or more Motor Vehicle Addenda specifying the current model types or series of new Motor Vehicles which Dealer may purchase under this Agreement. General Motors may change a Motor Vehicle Addendum by furnishing a superseding one, or may cancel an Addendum at any time.

General Motors will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner. Many factors affect the availability and distribution of Motor Vehicles to dealers, including component availability and available production capacity, sales potential in Dealer's Area of Primary Responsibility, varying consumer demand, weather and transportation conditions, governmental regulations, and other conditions beyond the control of General Motors. General Motors reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final. Upon written request, General Motors will advise Dealer of the total number of new Motor Vehicles, by allocation group, sold to dealers in Dealer's Market Area or Region during the preceding month.

## 6.2    Sale of Parts and Accessories to Dealer

New, reconditioned or remanufactured automotive parts and accessories marketed by General Motors and listed in current Dealer Parts and Accessories Price Schedules or supplements furnished to Dealer are called Parts and Accessories. Orders for Parts and Accessories will be submitted and processed according to written or electronic procedures established by General Motors or other designated suppliers.

## 6.3    Prices and Other Terms of Sale

### 6.3.1    Motor Vehicles

Prices, destination charges, and other terms of sale applicable to purchases of new Motor Vehicles will be those established according to Vehicle Terms of Sale Bulletins furnished periodically to Dealer.

Prices, destination charges, and other terms of sale applicable to any Motor Vehicle may be changed at any time. Except as otherwise provided in writing or electronically, changes apply to Motor Vehicles not shipped to Dealer at the time the changes are made effective. Dealer will receive written or electronic notice of any price increase before any Motor Vehicle to which such increase applies is shipped, except for initial prices for a new model year or for any new model or body type. Dealer has the right to cancel or modify the affected orders by delivering written or electronic notice to General Motors within 10 days after its receipt of the price increase notice in accordance with procedures established by General Motors.

If General Motors offers any incentives to customers or dealers, and payment is conditioned upon the purchase or lease of a new Motor Vehicle, Dealer agrees to comply with the then current applicable policies and procedures in the General Motors Incentive Manual, as amended from time to time.

### 6.3.2    Parts and Accessories

Prices and other terms of sale applicable to Parts and Accessories are established by General Motors according to the Parts and Accessories Terms of Sale Bulletin furnished to Dealer. Prices and other terms of sale applicable to Parts and Accessories may be changed by General Motors at any time. Such changes apply to Parts and Accessories not shipped to Dealer at the time changes become effective.

## 6.4    Inventory

### 6.4.1    Motor Vehicle Inventory

Dealer recognizes that customers expect Dealer to have a reasonable quantity and variety of current model Motor Vehicles in inventory. Accordingly, Dealer agrees to purchase and stock and General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility.

### 6.4.2    Parts and Accessories

Dealer agrees to stock sufficient Parts and Accessories made available by General Motors to perform warranty repairs and policy adjustments and meet customer demand.

9

### 6.5    Warranties on Products

General Motors warrants new Motor Vehicles and Parts and Accessories (Products) as explained in documents provided with the Products or in the Service Policies and Procedures Manual.

EXCEPT AS OTHERWISE PROVIDED BY LAW, THE WRITTEN GENERAL MOTORS WARRANTIES ARE THE ONLY WARRANTIES APPLICABLE TO PRODUCTS. WITH RESPECT TO DEALERS, SUCH WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES OR LIABILITIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY LIABILITY FOR COMMERCIAL LOSSES BASED UPON NEGLIGENCE OR MANUFACTURER'S STRICT LIABILITY EXCEPT AS MAY BE PROVIDED UNDER AN ESTABLISHED GENERAL MOTORS PROGRAM OR PROCEDURE, GENERAL MOTORS NEITHER ASSUMES NOR AUTHORIZES ANYONE TO ASSUME FOR IT ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH PRODUCTS, AND GENERAL MOTORS MAXIMUM LIABILITY IS TO REPAIR OR REPLACE THE PRODUCT.

# ARTICLE 7.  SERVICE OF PRODUCTS

### 7.1    Service for Which General Motors Pays

#### 7.1.1    New Motor Vehicle Pre-Delivery Inspections and Adjustments

Because new vehicle delivery condition is critical to customer satisfaction, Dealer agrees to perform specified pre-delivery inspections and adjustments on each new Motor Vehicle and verify completion according to procedures identified in the Service Policies and Procedures Manual.

#### 7.1.2    Warranty and Special Policy Repairs

Dealer agrees to perform (i) required warranty repairs on each qualified Motor Vehicle at the time of pre-delivery service and when requested by owner, and (ii) special policy repairs approved by General Motors. When the vehicle is returned to the owner, Dealer will provide owner a copy and explanation of the repair document reflecting all services performed.

#### 7.1.3    Campaign Inspections and Corrections

General Motors will notify Dealer of suspected unsatisfactory conditions on Products and issue campaign instructions. Dealer agrees to inspect and correct suspected unsatisfactory conditions on Products in accordance with the instructions. Dealer will also determine that campaign inspections and corrections have been made on new and used Motor Vehicles in its inventory prior to sale, and follow-up on Products on which campaigns are outstanding.

10

General Motors may ship, and Dealer agrees to accept, unordered parts and materials required for campaigns. Upon campaign completion, Dealer will receive credit for excess parts and materials so shipped if they are returned or disposed of according to General Motors instructions.

### 7.1.4 Payment for Pre-Delivery Adjustments, Warranty, Campaign and Transportation Damage Work

For Dealer's performance of services, pre-delivery inspections and adjustments, warranty repairs, special policy repairs, campaign inspections and corrections, and transportation damage repairs, General Motors will provide or pay Dealer for the Parts and other materials required and will pay Dealer a reasonable amount for labor. Payment will be made according to policies in the Service Policies and Procedures Manual. Dealer will not impose any charge for such service on owners or users except where a deductible or pro-rata charge applies.

## 7.2 Parts, Accessories, and Body Repairs

### 7.2.1 Warranty and Policy Repairs

Dealer agrees to use only genuine GM or General Motors approved Parts and Accessories in performing warranty repairs, special policy repairs, and any other repairs paid for by General Motors, in accordance with the applicable provisions of the Service Policies and Procedures Manual.

### 7.2.2 Representations and Disclosures as to Parts and Accessories

In servicing vehicles marketed by General Motors, Dealer agrees to disclose the use of recycled and non-General Motors parts and accessories as set forth in Article 5. 1. 1.

### 7.2.3 Body Repairs

Dealer agrees to provide quality body repair service for Motor Vehicles. Dealer can provide this service through its own body shop, or by arrangement with an alternate repair establishment approved by General Motors.

### 7.2.4 Tools and Equipment

Dealer agrees to provide and maintain on Dealership Premises essential service tools as required by General Motors, and such other tools and equipment as reasonably necessary to fulfill its responsibilities to properly diagnose and service Products. Dealer also agrees to allow General Motors or its designated representative to survey or inspect Dealer's tools and equipment to ensure that they are in good repair and proper calibration to enable Dealer to meet its service responsibilities. In the event a dispute arises from such a survey or inspection, General Motors personnel agree to discuss the matter with the Dealer in order to resolve the dispute.

# ARTICLE 8. TRAINING

Properly trained personnel are essential to the success of Dealer and General Motors, and to providing customers with a satisfactory sales and service experience. General Motors agrees to make available or recommend to Dealer product, sales, service and parts, accounting, business management, finance and insurance, and systems training courses for Dealer personnel. General Motors will make such training available through training sites, interactive distance learning, or other appropriate medium as determined by General Motors. General Motors will assist Dealer in determining training requirements and periodically will require that Dealer have personnel attend or participate in specific courses

held as conveniently as practicable. Dealer agrees to comply with any such reasonable training requirements and pay any specified training charges. General Motors will consult with the appropriate dealer council prior to determining the training courses or programs from which an individual Dealer's requirements under this Article may be established. Specific minimum service training requirements will be described in General Motors Service Policies and Procedures Manual.

General Motors will make available personnel to advise and counsel Dealer personnel on sales, service, parts and accessories, and related subjects.

# ARTICLE 9. REVIEW OF DEALER'S SALES PERFORMANCE

General Motors willingness to enter into this Agreement is based in part on Dealer's commitment to effectively sell and promote the purchase, lease and use of Products in Dealer's Area of Primary Responsibility. The success of General Motors and Dealer depends to a substantial degree on Dealer taking advantage of available sales opportunities.

Given this Dealer commitment, General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's sales performance. The report will compare Dealer's retail sales to retail sales opportunities by segment in Dealer's Area of Primary Responsibility or Area of Geographical Sales and

Service Advantage, whichever is applicable. General Motors will provide a written explanation of the sales review process to Dealer. Satisfactory performance of Dealer's sales obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100. If Dealer's Retail Sales Index is less than 100, Dealer's sales performance will be rated as provided in the General Motors Sales Evaluation process. General Motors expects Dealer to pursue available sales opportunities exceeding this standard. Additionally, General Motors expectations of its sales and registration performance for a Line-Make in a particular area may exceed this standard for individual dealer compliance.

In addition to the Retail Sales Index, General Motors will consider any other relevant factors in deciding whether to proceed under the provisions of Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities. General Motors will only pursue its rights under Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities if General Motors determines that Dealer has materially breached its sales performance obligations under this Dealer Agreement.

General Motors may modify the sales evaluation process from time to time and will consult with the appropriate dealer council before adopting such modifications.

# ARTICLE 10.  CAPITALIZATION

## 10.1   Net Working Capital

The Capital Standard Addendum reflects the minimum net working capital necessary for Dealer to conduct Dealership Operations. Dealer agrees to maintain at least this level of net working capital. General Motors will issue a new Addendum if changes in operating conditions or General Motors guidelines indicate capital needs have changed materially.

## 10.2   Wholesale Floorplan

To avoid damage to goodwill which could result if Dealer is financially unable to fulfill its commitments, Dealer agrees to have and maintain a separate line of credit from a creditworthy financial institution reasonably acceptable to General Motors and available to finance the Dealer's purchase of new vehicles in conformance with the policies and procedures established by General Motors. The amount of the line of credit will be sufficient for Dealer to meet its obligations under Article 6.4.

# ARTICLE 11.  ACCOUNTS AND RECORDS

## 11.1   Uniform Accounting System

A uniform accounting system facilitates an evaluation of Dealer business management practices and the impact of General Motors policies and practices. General Motors therefore agrees to maintain, and Dealer agrees to use and maintain records in accordance with a uniform accounting system set forth in an accounting manual furnished to Dealer. Dealer further agrees to submit to General Motors data in a manner specified by General Motors and on a timely basis.

## 11.2   Application for Payment

Dealer also agrees to timely submit true and accurate applications or claims for payments, discounts or allowances; true and correct orders for Products and reports of sale and delivery; and any other reports or statements required by General

Motors, in the manner specified by General Motors, and to retain such records for at least two years.

## 11.3    Examination of Accounts and Records

Dealer agrees to permit any designated representative of General Motors to access, examine, audit, and take copies of any of the accounts and records Dealer is to maintain under the accounting manual and this Agreement. Dealer agrees to make such accounts and records readily available at its facilities during regular business hours. General Motors agrees to furnish Dealer with a list of any reproduced records.

## 11.4    Confidentiality of Dealer Data

General Motors agrees not to furnish any personal or financial data submitted to it by Dealer to any non-affiliated entity unless authorized by Dealer, required by law, or in connection with judicial or administrative proceedings, or to proceedings under the Dispute Resolution Process.

# ARTICLE 12.  CHANGES IN MANAGEMENT AND OWNERSHIP

The parties recognize that customers and authorized dealers, as well as shareholders and employees of General Motors, have a vital interest in the continued success and efficient operation of General Motors dealer network. Accordingly, General Motors has the responsibility of continuing to administer the network to ensure that dealers are owned and operated by qualified persons able to meet the requirements of this Agreement.

## 12.1    Succession Rights Upon Death or Incapacity

### 12.1.1 Successor Addendum

Dealer can apply for a Successor Addendum designating a proposed dealer operator and/or owners of a successor dealer to be established if this Agreement expires or is terminated because of death or incapacity. General Motors will execute the Addendum provided Dealer is meeting its obligations under this Agreement and under any Dealer Agreement which Dealer may have with General Motors for the conduct of Dealership Operations at the approved location; and the proposed dealer operator is, and will continue to be, employed full-time by Dealer or a comparable automotive dealership, and is already qualified or is being trained to qualify as a dealer operator; and provided all other proposed owners are acceptable.

Upon expiration of this Agreement, General Motors will, upon Dealer's request, execute a new successor addendum provided a new and superseding dealer agreement is executed with Dealer, and Dealer, the proposed dealer operator and dealer owners are then qualified as described above.

### 12.1.2 Absence of Successor Addendum

If this Agreement expires or is terminated because of death or incapacity and Dealer and General

14

Motors have not executed a Successor Addendum, the Dealer Operator or, if there is not a remaining Dealer Operator, the remaining dealer owners may propose a successor dealer to continue the operations identified in this Agreement. The proposal must be made to General Motors in writing at least 30 days prior to the expiration or termination of this Agreement, including any deferrals. If there are more than one dealer owners remaining, these persons may only propose a successor dealer if they can agree on such proposal.

### 12.1.3  Successor Dealer Requirements

General Motors will accept a proposal to establish a successor dealer submitted by a proposed dealer operator under this Article 12.1 provided:

(a) the proposed successor dealer and the proposed dealer operator are ready, willing and able to meet the requirements of a new dealer agreement at the approved location(s).

(b) General Motors approves the proposed dealer operator and all proposed owners not previously approved for the existing Dealership Operations.

(c) all outstanding monetary obligations of Dealer to General Motors have been satisfied.

### 12.1.4  Term of New Dealer Agreement

The dealer agreement offered a successor dealer will be for a three-year term. General Motors will notify the successor dealer in writing at least 90 days prior to the expiration date whether the successor dealer has performed satisfactorily and, if so, that General Motors will offer a new Dealer Agreement.

### 12.1.5  Limitation on Offers

Dealer will be notified in writing of the decision on a proposal to establish a successor dealer submitted under Article 12.1 within 60 days after General Motors has received from Dealer all applications and information reasonably requested by General Motors. General Motors may condition its offer of a dealer agreement on the relocation of dealership operations to an approved location by successor dealer within a reasonable time. General Motors offer of a new dealer agreement under this Article 12.1 will automatically expire if not accepted in writing by the proposed successor dealer within 60 days after it receives the offer.

### 12.1.6  Cancellation of Addendum

Dealer may cancel an executed Successor Addendum at any time prior to the death of a Dealer Operator or the incapacity of Dealer Operator. General Motors may cancel an executed Successor Addendum only if the proposed dealer operator is no longer qualified under Article 12.1.1.

### 12.2  Other Changes in Ownership or Management

If Dealer proposes a change in Dealer Operator, a change in ownership, or a transfer of the dealership business or its principal assets to any person conditioned upon General Motors entering into a Dealer Agreement with that person, General Motors will consider Dealer's proposal and not arbitrarily refuse to approve it, subject to the following:

12.2.1 Dealer agrees to give General Motors prior written notice of any proposed change or transfer described above. Dealer understands that

if any such change is made prior to General Motors approval of the proposal, termination of this Agreement will be warranted and General Motors will have no further obligation to consider Dealer's proposal.

12.2.2   General Motors agrees to consider Dealer's proposal, taking into account factors such as (a) the personal, business, and financial qualifications of the proposed dealer operator and owners, and (b) whether the proposed change is likely to result in a successful dealership operation with acceptable management, capitalization, and ownership which will provide satisfactory sales, service, and facilities at an approved location, while promoting and preserving competition and customer satisfaction.

12.2.3   General Motors will notify Dealer in writing of General Motors decision on Dealer's proposal within 60 days after General Motors has received from Dealer all applications and information reasonably requested by General Motors. If General Motors disagrees with the proposal, it will specify its reasons. General Motors may request that Dealer submit such applications and information in writing or electronically.

12.2.4   Any material change in Dealer's proposal, including change in price, facilities, capitalization, proposed owners, or dealer operator, will be considered a new proposal, and the time period for General Motors to respond shall recommence.

12.2.5   General Motors prior written approval is not required where the transfer of equity ownership or beneficial interest to an individual is (a) less than ten percent in a calendar year, and (b) between existing dealer owners previously approved by General Motors where there is no change in majority ownership or voting control. Dealer agrees to notify General Motors within 30 days of the date of the change and to execute a new Dealer Statement of Ownership.

12.2.6   General Motors is not obligated to approve any proposed changes in management or ownership under this Article unless Dealer makes arrangements acceptable to General Motors to satisfy any indebtedness of Dealer to General Motors and other commitments of Dealer to General Motors.

## 12.3   Right of First Refusal to Purchase
### 12.3.1   Creation and Coverage

If Dealer submits a proposal for a change of ownership under Article 12.2, General Motors will have a right of first refusal to purchase the dealership assets or stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer. If General Motors chooses to exercise this right, it will do so in its written response to Dealer's proposal. General Motors will have a reasonable opportunity to inspect the assets, including real estate, and corporate records before making its decision.

### 12.3.2 Purchase Price and Other Terms of Sale

#### (a) Bona Fide Agreement

If Dealer has entered into a bona fide written buy/sell agreement, the purchase price and other terms of sale will be those set forth in such agreement and any related documents, unless Dealer and General Motors agree to other terms.

Upon General Motors request, Dealer agrees to provide all documents relating to the proposed transfer. If Dealer refuses to provide such documentation or state in writing that such documents do not exist, it will be presumed that the agreement is not bona fide.

#### (b) Absence of Bona Fide Agreement

In the absence of a bona fide written buy/sell agreement, the purchase price of the dealership assets or stock and such other rights as proposed to be transferred will be determined by good faith negotiations by Dealer and General Motors. If agreement cannot be reached within a reasonable time, the price and other terms of sale will be established by arbitration according to the rules of the American Arbitration Association.

### 12.3.3 Consummation

Dealer agrees to transfer the property by Warranty Deed, where possible, conveying marketable title free and clear of liens and encumbrances. The Warranty Deed will be in proper form for recording and Dealer will deliver complete possession of the property when the Deed is delivered. Dealer will also furnish copies of any easements, licenses or other documents affecting the property and assign any permits or licenses necessary for the conduct of Dealership Operations.

### 12.3.4 Assignment

General Motors rights under this section may be assigned to any third party ("Assignee"). If there is an assignment, General Motors will guarantee full payment of the purchase price by the Assignee. General Motors shall have the opportunity to discuss the terms of the buy/sell agreement with the potential Assignee(s).

General Motors rights under this Article are binding on and enforceable against any assignee or successor in interest of Dealer or purchaser of Dealer's assets or stock and such other rights as proposed to be transferred.

### 12.3.5 Transfer Involving Family Members and Dealer Management

When the proposed change of ownership involves a transfer by a dealer owner solely to a member or members of his or her immediate family, or to a qualifying member of Dealer's Management, General Motors right of first refusal will not apply. An "immediate family member" shall be the spouse, child, grandchild, spouse of a child or grandchild, brother, sister or parent of the dealer owner. A "qualifying member of Dealer's Management" shall be an individual who has been employed by Dealer for at least two years and otherwise qualifies as a dealer operator.

17

### 12.3.6 Expenses

If General Motors exercises its right of first refusal, General Motors agrees to pay the proposed owner the reasonable expenses, including reasonable attorney fees, that do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, and that are incurred by the proposed owner in negotiating and implementing the contract for the proposed change in Dealer ownership before General Motors gives notice of its exercise of its right of first refusal. The proposed owner must provide a reasonable accounting and documentation of such expenses to receive such reimbursement.

# ARTICLE 13. BREACHES AND OPPORTUNITY TO REMEDY

### 13.1   Certain Acts or Events

The following acts or events, which are within the control of Dealer or originate from action taken by Dealer or its management or owners, are material breaches of this Agreement. If General Motors learns that any of the acts or events has occurred, it may notify the Dealer in writing. If notified, Dealer will be given the opportunity to respond in writing within 30 days of receipt of the notice, explaining or correcting the situation to General Motors satisfaction.

*13.1.1* The removal, resignation, withdrawal, or elimination from Dealer for any reason of any Dealer Operator or dealer owner without General Motors prior written approval.

*13.1.2* Any attempted or actual sale, transfer, or assignment by Dealer of this Agreement or any of the rights granted Dealer hereunder, or any attempted or actual transfer, assignment or delegation by Dealer of any of the responsibilities assumed by it under this Agreement contrary to the terms of this Agreement.

*13.1.3* Any change, whether voluntary or involuntary, in the record or beneficial ownership of Dealer as set forth in the Dealer Statement of Ownership furnished by Dealer, unless permitted by Article 12.2.5 or pursuant to General Motors written approval.

*13.1.4* Any undertaking by Dealer or any of its owners to conduct, either directly or indirectly, any of the Dealership Operations at any un-approved location.

*13.1.5* Any sale, transfer, relinquishment, discontinuance, or change of use by Dealer of any of the Dealership Premises or other principal assets required in the conduct of the Dealership Operations, without General Motors prior written approval.

*13.1.6* Any dispute among the owners or management personnel of Dealer which, in General Motors opinion, may adversely affect the Dealership Operations or the interests of Dealer or General Motors.

*13.1.7* Refusal by Dealer to timely furnish sales, service or financial information and related supporting data, or to permit General Motors examination or audit of Dealer's accounts and records.

*13.1.8* A finding by a government agency or court of original jurisdiction or a settlement arising from charges that Dealer, or a predecessor of Dealer owned or controlled by the same person, had committed a misdemeanor or unfair or deceptive business practice which, in General Motors opinion, may adversely affect the reputation or interests of Dealer or General Motors.

*13.1.9* Willful failure of Dealer to comply with the provisions of any laws or regulations relating to the sale or service of Products.

*13.1.10* Submission by Dealer of false applications or reports, including false orders for Products or reports of delivery or transfer of Products.

*13.1.11* Failure of Dealer to maintain the line of credit required by Article 10.

*13.1.12* Failure of Dealer to timely pay its obligations to General Motors.

*13.1.13* Refusal by Dealer to permit General Motors or any designated representative of General Motors to access, examine, audit, or take copies of any of the accounts or records Dealer is to maintain under the accounting manual and this Agreement.

*13.1.14* Any other material breach of Dealer's obligations under this Agreement not otherwise identified in this Article 13 or in Article 14.

If Dealer's response demonstrates that the breach has been corrected, or otherwise explains the circumstances to General Motors satisfaction, then General Motors shall confirm this fact in writing to Dealer. If, however, Dealer's response does not demonstrate that the breach has been corrected, or explain the circumstances to General Motors satisfaction, termination is warranted and General Motors may terminate this Agreement upon written notice to Dealer. Termination will be effective 60 days following Dealer's receipt of the notice.

## 13.2    Failure of Performance by Dealer

If General Motors determines that Dealer's Premises are not acceptable, or that Dealer has failed to adequately perform its sales or service responsibilities, including those responsibilities relating to customer satisfaction and training, General Motors will review such failure with Dealer.

As soon as practical thereafter, General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than six months) during which Dealer will have the opportunity to correct the failure.

If Dealer does correct the failure by the expiration of the period, General Motors will so advise the Dealer in writing. If, however, Dealer remains in material breach of its obligations at the expiration of the period, General Motors may terminate this Agreement by giving Dealer 90 days advance written notice.

# ARTICLE 14. TERMINATION OF AGREEMENT

## 14.1   By Dealer

Dealer has the right to terminate this Agreement without cause at any time upon written notice to General Motors. Termination will be effective 30 days after General Motors receipt of the notice, unless otherwise mutually agreed in writing.

## 14.2   By Agreement

This Agreement may be terminated at any time by written agreement between General Motors and Dealer. Termination assistance will apply only as specified in the written termination agreement.

## 14.3   Failure to be Licensed

If General Motors or Dealer fails to secure or maintain any license required for the performance of obligations under this Agreement or such license is suspended or revoked, either party may terminate this Agreement by giving the other party fifteen days written notice. Dealer may only conduct Dealership Operations if permitted by law.

## 14.4   Incapacity of Dealer Operator

Because this is a Personal Services Agreement, General Motors may terminate this Agreement by written notice to Dealer if Dealer Operator is so physically or mentally incapacitated that the Dealer Operator is unable to actively exercise full managerial authority. The effective date of termination will be stated in such written notice and will be not less than three months after receipt of such notice.

## 14.5   Acts or Events

If General Motors learns that any of the following has occurred, it may terminate this Agreement by giving Dealer written notice of termination. Termination will be effective on the date specified in the notice.

14.5.1 . Conviction in a court of original jurisdiction of Dealer, or a predecessor of Dealer owned or controlled by the same person, or any Dealer Operator or dealer owner of any felony.

14.5.2 Insolvency of Dealer; or filing by or against Dealer of a petition in bankruptcy; or filing of a proceeding for the appointment of a receiver or trustee for Dealer, provided such filing or appointment is not dismissed or vacated within thirty days; or execution by Dealer of an assignment for the benefit of creditors or any foreclosure or other due process of law whereby a third party acquires rights to the operation, ownership or assets of Dealer.

20

*14.5.3* Failure of Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days.

*14.5.4* Any misrepresentation to General Motors by Dealer or by any Dealer Operator or owner in applying for this Agreement, or in identifying the Dealer Operator, or record of beneficial ownership of Dealer.

*14.5.5* Submission by Dealer of false applications or claims for any payment, credit, discount, or allowance, including false applications in connection with incentive activities, where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment.

Termination for failure to correct other breaches will be according to the procedures outlined in Article 13.

## 14.6    Reliance on Any Applicable Termination Provision

The terminating party may select the provision under which it elects to terminate without reference in its notice to any other provision that may also be applicable. The terminating party subsequently also may assert other grounds for termination.

## 14.7    Transactions After Termination
### 14.7.1 Effect on Orders

If Dealer and General Motors do not enter into a new Dealer Agreement when this Agreement expires or is terminated, all of Dealer's outstanding orders for Products will be automatically canceled except as provided in this Article 14.7.

Termination of this Agreement will not release Dealer or General Motors from the obligation to pay any amounts owing the other, nor release Dealer from the obligation to pay for Special Vehicles if General Motors has begun processing such orders prior to the effective date of termination.

### 14.7.2    Termination Deliveries

If this Agreement is voluntarily terminated by Dealer or expires or is terminated because of the death or incapacity of a Dealer Operator or death of a Dealer Owner, without a termination or expiration deferral, General Motors will use its best efforts consistent with its distribution procedures to furnish Dealer with Motor Vehicles to fill Dealer's bona fide retail sold orders with customers as of the effective date of termination or expiration, not to exceed, however, the total number of Motor Vehicles invoiced to Dealer for retail sale during the three months immediately preceding the effective date of termination.

### 14.7.3 *Effect of Transactions After Termination*

Neither the sale of Products to Dealer nor any other act by General Motors or Dealer after termination of this Agreement will be construed as a waiver of the termination.

## ARTICLE 15. TERMINATION ASSISTANCE

### 15.1 *Deferral of Effective Date*

If this Agreement is scheduled to expire or terminate because of the death or incapacity of a Dealer Operator or the death of a Dealer Owner and Dealer requests an extension of the effective date of expiration or termination thirty days prior to such date, General Motors will defer the effective date for up to a total of eighteen months after such death or incapacity occurs to assist Dealer in winding up its Dealership Operations.

### 15.2 *Purchase of Personal Property*
#### 15.2.1 *General Motors Obligations*

If this Agreement: a) expires or is terminated by Dealer, and General Motors does not offer Dealer or a replacement dealer a new dealer agreement, or b) is terminated by General Motors for cause under the Dealer Agreement, General Motors will offer to purchase the following items of personal property (herein called Eligible Items) from Dealer at the prices indicated:

(a) New and unused Motor Vehicles of the current model year purchased by Dealer from General Motors at a price equal to the net prices and charges that were paid to General Motors;

(b) Any signs owned by Dealer of a type recommended in writing by General Motors and bearing any Marks at a price agreed upon by General Motors and Dealer. If General Motors and Dealer cannot agree on a price, they will select a third party who will set the price;

(c) Any essential tools recommended by General Motors and designed specifically for service of Motor Vehicles that General Motors offered for sale during the three years preceding termination at prices established in accordance with the applicable pricing formula in the Service Policies and Procedures Manual; and

(d) Unused and undamaged Parts and Accessories that (i) are still in the original, re-salable merchandising packages and in unbroken lots (in the case of sheet metal, a comparable substitute for the original package may be used); (ii) are listed for sale in the then current Dealer Parts and Accessories Price Schedules (except those items marked NOT ELIGIBLE Parts and Accessories); and (iii) were purchased by Dealer either directly from General Motors or from an outgoing dealer as a part of Dealer's initial Parts and Accessories inventory. Prices will be those dealer prices in effect at the time General Motors receives the Parts and Accessories, less any applicable allowances whether or not any such allowances were made to Dealer when Dealer purchased the Parts and Accessories. In addition, an allowance of five percent of dealer price for packing costs and reimbursement for transportation charges to the destination specified by General Motors will be credited to Dealer's account.

## 15.2.2 Dealer's Responsibilities

General Motors obligation to purchase Eligible Items is subject to Dealer fulfilling its responsibility under this subsection.

Within fifteen days following the effective date of termination or expiration of this Agreement, Dealer will furnish General Motors with a list of vehicle identification numbers and such other information as General Motors may request pertaining to eligible Motor Vehicles. Dealer will deliver the eligible Motor Vehicles to a destination determined by General Motors that will be in a reasonable proximity to Dealer's Premises.

Within two months following the effective date of termination or expiration of this Agreement, Dealer will mail or deliver to General Motors a complete and separate list of each of the Eligible Items other than Motor Vehicles. Dealer will retain the Eligible Items until receipt of written shipping instructions from General Motors. Within thirty days after receipt of instructions, Dealer will ship the Eligible Items, transportation charges prepaid, to the destinations specified in the instructions.

Dealer will take action and execute and deliver such instruments as necessary to (a) convey to General Motors good and marketable title to all Eligible Items to be purchased, (b) comply with the requirements of any applicable state law relating to bulk sales or transfer, and (c) satisfy and discharge any liens or encumbrances on Eligible Items prior to their delivery to General Motors.

## 15.2.3 Payment

Subject to Article 17.10, General Motors will pay for the Eligible Items as soon as practicable following their delivery to the specified destinations. Payment may be made directly to anyone having a security or ownership interest in the Eligible Items.

If General Motors has not paid Dealer for the Eligible Items within two months after delivery, and if Dealer has fulfilled its termination obligations under this Agreement, General Motors will, at Dealer's written request, estimate the purchase price of the unpaid Eligible Items and all other amounts owed Dealer by General Motors. After deducting the amounts estimated to be owing General Motors and its subsidiaries by Dealer, General Motors will pay Dealer 75 percent of the net amount owed Dealer and will pay the balance, if any, as soon as practicable thereafter.

## 15.2.4  Replacement Dealer

If Dealer intends to terminate its Dealer Agreement and General Motors has approved a replacement dealer, the Dealer or replacement dealer may submit electronically to General Motors prior to the closing a listing of the Dealer's parts inventory, and General Motors will advise the Dealer or replacement dealer within thirty days what parts General Motors is willing to repurchase under General Motors policies and procedures then in effect upon Dealer's termination of its Dealer Agreement. General Motors will assist the replacement dealer in establishing an appropriate Motor Vehicle inventory as provided in Article 6.4.1.

### 15.3   Assistance on Premises

#### 15.3.1  General Motors Obligation

Subject to Article 17.10, General Motors agrees to give Dealer assistance in disposing of the Premises as provided below if (i) this Agreement expires for any reason or is terminated by General Motors under Articles 13.2 or 14.4 and (ii) Dealer is not offered a new Dealer Agreement. Such assistance shall be given only on Premises that are described in the Location and Premises Addendum and only if:

(a) they are used solely for Dealership Operations (or similar dealership operations under other agreements with   General Motors which will be terminated simultaneously with this Agreement); and

(b) they are not substantially in excess of space requirements at the time of termination or, if they are substantially in excess, they became excessive because of a reduction in the requirements applicable to Dealer's facilities.

Any Dealer request for such assistance must be in writing and received by General Motors within thirty days of the expiration or termination of this Agreement.

Premises that consist of more than one parcel of property or more than one building, each of which is separately usable, distinct and apart from the whole or any other part with appropriate ingress or egress, shall be considered separately under this Article 15.3.

#### 15.3.2  Owned Premises

General Motors will provide assistance on owned Premises by either (a) locating a purchaser who will offer to purchase the Premises at a reasonable price, or (b) locating a lessee who will offer to lease the Premises. If General Motors does not locate a purchaser or lessee within a reasonable time, General Motors will itself either purchase or, at its option, lease the Premises for a reasonable term at a reasonable rent. If the cause of termination or expiration is a death or the incapacity of the Dealer Operator, General Motors may instead pay Dealer a sum equal to a reasonable rent for a period of twelve months immediately following the effective date of termination or expiration of this Agreement.

#### 15.3.3  Leased Premises

General Motors will provide assistance on leased Premises by either:

(a) locating a tenant(s), satisfactory to lessor, who will sublet for the balance of the lease or assume it; or

(b) arranging with the lessor for the cancellation of the lease without penalty to Dealer; or

(c) reimbursing Dealer for the lesser of the rent specified in the lease or settlement agreement or a reasonable rent for a period equal to the lesser of twelve months from the effective date or termination or expiration of the balance of the lease term.

Upon request, Dealer will use its best efforts to effect a settlement of the lease with the lessor subject to General Motors prior approval of the terms. General Motors is not obligated to reimburse Dealer for rent for any month during which the Premises are occupied by Dealer or anyone else, after the first month following the effective date of termination or expiration.

### 15.3.4  Rent and Price

General Motors and Dealer will fix the amount of a reasonable rent and a reasonable price for the Premises by agreement at the time Dealer requests assistance. The factors to be considered in fixing those amounts are:

(a) the adequacy and desirability of the Premises for a dealership operation; and

(b) the fair market value of the Premises. If General Motors and Dealer cannot agree, the fair market value will be determined by the median appraisal of three qualified real estate appraisers, of whom Dealer and General Motors will each select one and the two selected will select the third. The cost of appraisals will be shared equally by Dealer and General Motors.

### 15.3.5  Limitations on Obligation to Provide Assistance

General Motors will not be obligated to provide assistance on Premises if Dealer:

(a) fails to accept a bona fide offer from a prospective purchaser, sub-lessee or assignee;

(b) refuses to execute a settlement agreement with the lessor if the agreement would be without cost to Dealer;

(c) refuses to use its best efforts to effect a settlement when requested by General Motors; or

(d) refuses to permit General Motors to examine Dealer's books and records if necessary to verify claims of Dealer under this Article.

Any amount payable by General Motors as rental reimbursement or reasonable rent shall be proportionately reduced if the Premises are leased or sold to another party during the period for which such amount is payable. Payment of rental reimbursement or reasonable rent is waived by Dealer if it does not file its claim therefor within two months after the expiration of the period covered by the payment. Upon request, Dealer will support its claim with satisfactory evidence of its accuracy and reasonableness.

# ARTICLE 16.  DISPUTE RESOLUTION PROCESS

Dealer and General Motors recognize that it is desirable to resolve disputes in a fair, prompt, and cost efficient manner. Therefore, except for the matters specified below, and except as otherwise specifically agreed upon in writing between Dealer and General Motors, Dealer and General Motors agree to mediate any dispute arising under this Agreement or applicable law using the General Motors Dispute Resolution Process then in effect, a copy of which has been provided to Dealer, before

using other remedies available under federal, state or local law. The matters ineligible for mediation include: (i) terminations due to insolvency, a dealer's failure to conduct customary sales and service operations during customary business hours for at least seven consecutive business days, license revocation, fraud or felony convictions, (ii) disputes requiring participation by a third party who does not agree to participate in the mediation, and (iii) disputes of General Motors Policies or Procedures as

applied to dealers generally. Dealer or General Motors may file simultaneously with a court or administrative agency if necessary to retain its rights under applicable law. Mediation under the General Motors Dispute Resolution Process is mandatory, but mediation is not binding on the parties unless the parties agree upon a solution. If a dispute is not resolved through mediation, Dealer and General Motors may agree to resolve this dispute through voluntary binding arbitration available under the General Motors Dispute Resolution Process.

The General Motors Dispute Resolution Process is set forth in a separate booklet, and this Process will be administered by a Joint Mediation/Arbitration Committee composed of dealers and General Motors representatives. General Motors may amend the Process from time to time, but will consult with the Joint Mediation/Arbitration Committee before making any changes.

# ARTICLE 17.  GENERAL PROVISIONS

## 17.1  No Agent or Legal Representative Status

This Agreement does not make either party the agent or legal representative of the other for any purpose, nor does it grant either party authority to assume or create any obligation on behalf of or in the name of the others. No fiduciary obligations are created by this Agreement.

## 17.2  Responsibility for Operations

Except as provided in this Agreement, Dealer is solely responsible for all expenditures, liabilities and obligations incurred or assumed by Dealer for the establishment and conduct of its operations.

## 17.3  Taxes

Dealer is responsible for all local, state, federal, or other applicable taxes and tax returns related to its dealership business and will hold General Motors harmless from any related claims or demands made by any taxing authority.

## 17.4  Indemnification by General Motors

General Motors will assume the defense of Dealer and indemnify Dealer against any judgment for monetary damages or rescission of contract, less any offset recovered by Dealer, in any lawsuit naming Dealer as a defendant relating to any Product that has not been altered when the lawsuit concerns:

### 17.4.1  Breach of the General Motors warranty related to the Product, bodily injury or property damage claimed to have been caused solely by a defect in the design, manufacture, or assembly of a Product by General Motors (other than a defect which should have been detected by Dealer in a reasonable inspection of the Product);

### 17.4.2  Failure of the Product to conform to the description set forth in advertisements or product brochures distributed by General Motors because of changes in standard equipment or material component parts unless Dealer received notice of the changes prior to retail delivery of the affected Product by Dealer; or

*17.4.3* Any substantial damage to a Product purchased by Dealer from General Motors which has been repaired by General Motors unless Dealer has been notified of the repair prior to retail delivery of the affected Product.

If General Motors reasonably concludes that allegations other than those set forth in 17.4.1, 17.4.2, or 17.4.3 above are being pursued in the lawsuit, General Motors shall have the right to decline to accept the defense or indemnify dealer or, after accepting the defense, to transfer the defense back to Dealer and withdraw its agreement to indemnify Dealer.

Procedures for requesting indemnification, administrative details, and limitations are contained in the Service Policies and Procedures Manual under "Indemnification." The obligations assumed by General Motors are limited to those specifically described in this Article and in the Service Policies and Procedures Manual and are conditioned upon compliance by Dealer with the procedures described in the Manual. This Article shall not affect any right either party may have to seek indemnification or contribution under any other contract or by law and such rights are hereby expressly preserved.

## 17.5   Trademarks and Service Marks

General Motors or affiliated companies are the exclusive owners or licensees of the various trademarks, service marks, names and designs (Marks) used in connection with Products and services.

Dealer is granted the non-exclusive right to display Marks in the form and manner approved by General Motors in the conduct of its dealership business. Dealer agrees to permit any designated representative of General Motors upon the Premises during regular business hours to inspect Products or services in connection with Marks.

Dealer will not apply to register any Marks either alone or as part of another mark, and will not take any action which may adversely affect the validity of the Marks or the goodwill associated with them. Dealer will not apply to register any name which includes a Mark as an Internet domain name without General Motors prior written approval.

Dealer agrees to purchase and sell goods bearing Marks only from parties authorized or licensed by General Motors.

Marks may be used as part of the Dealer's name with General Motors written approval. Dealer agrees to change or discontinue the use of any Marks upon General Motors request.

Dealer agrees that no company owned by or affiliated with Dealer or any of its owners may use any Mark to identify a business without General Motors written permission.

Upon termination of this Agreement, Dealer agrees to immediately discontinue, at its expense, all use of Marks. Thereafter, Dealer will not use, either directly or indirectly, any Marks or any other confusingly similar marks in a manner that General Motors

determines is likely to cause confusion or mistake or deceive the public.

Dealer will reimburse General Motors for all legal fees and other expenses incurred in connection with action to require Dealer to comply with this Article 17.5.

### 17.6   Notices

Any notice required to be given by either party to the other in connection with this Agreement will be in writing and delivered personally or by first class or express mail or by facsimile, or electronically as provided in this Agreement. Notices to Dealer will be directed to Dealer or its representatives at Dealer's principal place of business and, except for indemnification requests made pursuant to Article 17.4, notices by Dealer will be directed to the appropriate Regional General Manager of General Motors.

### 17.7   No Implied Waivers

The delay or failure of either party to require performance by the other party or the waiver by either party of a breach of any provision of this Agreement will not affect the right to subsequently require such performance.

### 17.8   Assignment of Rights or Delegation of Duties

Dealer has not paid any fee for this Agreement. Neither this Agreement nor any right granted by this Agreement is a property right.

Except as provided in Article 12, neither this Agreement nor the rights or obligations of Dealer

may be sold, assigned, delegated, encumbered or otherwise transferred by Dealer.

General Motors may assign this Agreement and any rights, or delegate any obligations, under this Agreement to any affiliated or successor company, and will provide Dealer written notice of such assignment or delegation. Such assignment or delegation shall not relieve General Motors of liability for the performance of its obligations under this Agreement.

### 17.9   No Third Party Benefit Intended

This Agreement is not enforceable by any third parties and is not intended to convey any rights or benefits to anyone who is not a party to this Agreement.

### 17.10  Accounts Payable

All monies or accounts due Dealer are net of Dealer's indebtedness to General Motors and its subsidiaries. In addition, General Motors may deduct any amounts due or to become due from Dealer to General Motors or its subsidiaries, or any amounts held by General Motors, from any sums or accounts due or to become due from General Motors, or its subsidiaries.

### 17.11  Sole Agreement of Parties

Except as provided in this Agreement or in any other unexpired written agreements executed by both parties, General Motors has made no promises to Dealer, Dealer Operator, or dealer owner and there are no other agreements or understandings, either oral or written, between the parties affecting this

Agreement or relating to any of the subject matters covered by this Agreement.

Except as otherwise provided herein, this Agreement cancels and supersedes all previous agreements between the parties that relate to any matters covered herein, except as to any monies which may be owing between the parties and any other unexpired written agreements executed by both parties.

No agreement between General Motors and Dealer which relates to matters covered herein, and no change in, addition to (except the filling in of blank lines) or erasure of any printed portion of this Agreement, will be binding unless permitted under the terms of this Agreement or related documents, or approved in a written agreement executed as provided in this Agreement.

## 17.12  Applicable Law Agreement

This agreement is governed by the laws of the State of Michigan. However, if performance under this Agreement is illegal under a valid law of any jurisdiction where such performance is to take place, performance will be modified to the minimum extent necessary to comply with such law if it was effective as of the effective date of this Agreement.

## 17.13  Superseding Dealer Agreements

If General Motors offers a superseding form of dealer agreement or an amendment to the dealer agreement to General Motors dealers generally at any time prior to expiration of this Agreement, General Motors may terminate this Agreement by ninety days prior written notice to Dealer, provided General Motors offers Dealer a dealer agreement in the superseding form for a term of not less than the un-expired term of this Agreement.

Unless otherwise agreed in writing, the rights and obligations of Dealer that may otherwise become applicable upon termination or expiration of the term of this Agreement shall not be applicable if General Motors and Dealer execute a superseding dealer agreement, and the matured rights and obligations of the parties hereunder shall continue under the new agreement.

Dealer's performance under any prior agreement may be considered in an evaluation of Dealer's performance under this or any succeeding agreement.

# GLOSSARY

**Area of Primary Responsibility** — The geographic area designated by General Motors from time to time in a Notice of Area of Primary Responsibility.

**Dealer** — The corporation, partnership, proprietorship, limited liability corporation, or limited liability partnership that signs the Dealer Agreement with General Motors.

**Dealer Agreement** — The Dealer Sales and Service Agreement, including the Agreement proper that is executed, the Standard Provisions, and all of the related Addenda.

**Dealership Operations** — All operations contemplated by the Dealer Agreement. These operations include the sale and service of Products and any other activities undertaken by Dealer related to Products, including rental and leasing operations, used vehicle sales and body shop operations, finance and insurance operations, any electronic commerce, and any service of other General Motors motor vehicles authorized by General Motors, whether conducted directly or indirectly by Dealer.

**General Motors** — General Motors Corporation.

**Incentives Manual** — The Manual issued periodically which details certain policies and procedures related to dealer or customer incentives or promotions.

**Line-Make** — A brand of General Motors Motor Vehicles, or a brand used to badge motor vehicles for another manufacturer. For this Dealer Agreement, the General Motors brands are Chevrolet Passenger Vehicles and Light Duty Trucks, Chevrolet Medium Duty Trucks, Pontiac Motor Vehicles, Oldsmobile Motor Vehicles, Buick Motor Vehicles, Cadillac Motor Vehicles, GMC Light Duty Trucks, and GMC Medium Duty Trucks.

**Products** — Motor Vehicles, Parts and Accessories.

**Motor Vehicles** — All current model types or series of new motor vehicles specified in any Motor Vehicle Addendum incorporated into this Agreement and all past General Motors motor vehicles marketed through Motor Vehicle Dealers.

**Service Policies and Procedures Manual** — The Manual issued periodically which details certain administrative and performance requirements for Dealer service under the Dealer Agreement.

**Special Vehicles** — Motor Vehicles that have limited marketability because they differ from standard specifications or incorporate special equipment.