UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LESLIE T HASKINS, INC., d/b/a HASKINS
OLDSMOBILE, a Massachusetts corporation,
        Plaintiff,                                      CIVIL ACTION
vs.                                                     CASE NO. 1:05-cv-10524-RCL

GENERAL MOTORS CORPORATION,
a Delaware Corporation

        Defendant.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Leslie T. Haskins, Inc., d/b/a Haskins Oldsmobile ("Haskins"), hereby files its

response to General Motors Corporation's ("GM") Motion to Dismiss and states:

## I.    INTRODUCTION

This action arises from the now concrete decision of GM to decline to renew all

remaining Oldsmobile franchise agreements in the United States. The decision not to renew these

specific franchise agreements was made with full knowledge of the consequences imposed by

state law and  GM's written commitments in its franchise agreement.

GM has not withdrawn from the product line of producing passenger cars and vans. On

the contrary, GM has simply dismantled the Oldsmobile Brand, systematically eliminated all

Oldsmobile models and series of models, and dismantled the Oldsmobile dealer network.

Oldsmobile products have merely been transferred to other line-makes for future use. Haskins

seeks just compensation for the loss.

GM's TFAP Program is a preemptive response to an amalgamation of various obligations

and duties which reside uniquely with GM. These duties and obligations arise from GM's

franchise agreement and state law.  However, the primary signal the TFAP Program conveys is

that GM knows, as a matter of institutional knowledge, that it is singularly responsible for the

damages it has wrought upon its once flourishing Oldsmobile dealer body.

Finally, GM offers this Court a grab bag of various opinions and dispositions with respect

to Oldsmobile litigation which has been previously adjudicated. If any common thread can be

gleaned from these decisions, it is that every federal court which has dealt with the Oldsmobile

saga has ensured that the affected dealer retained a clear and adequate means of compensation

under the law. Although there are differing federal views of what the common law provides to an

affected dealer, the uniform disposition was to provide and allow a remedy to right the obvious

wrong which has been effected. This is the commonality which all the subject federal decisions

share.

## II.     MASSACHUSETTS DEALER'S BILL OF RIGHTS

It is well established that the Massachusetts Dealer's Bill of Rights[1] was "enacted in

recognition of the potentially oppressive power of automobile manufacturers and distributors in

relation to their affiliated dealers." *Beard Motors, Inc. v. Toyota Motor Distribs., Inc.*, 480

N.E.2d 303, 306 (Mass. 1985).  Prior to the Motor Vehicle Dealer Franchise Act, "manufacturers

and distributors had virtually complete control over their dealers as a result of their awesome

power to terminate or fail to renew a franchise." *Id.* (Citations omitted).  Massachusetts enacted

Chapter 93B with the purpose of protecting dealers from these inequities. *Id.* Not surprisingly,

GM's Motion to Dismiss ignores the purpose and the protections of the Dealer's Bill of Rights.

---

[1]Set forth in M.G.L.A. c. 93B.

–2–

### A.    Massachusetts Unfair Termination Provision

GM argues, without substantive elaboration, that Haskins cannot state a cause of action

under M.G.L.A. c. 93B. GM's argument in support of its Motion to Dismiss completely ignores

M.G.L.A. c. 93B, § 5(a), which provides that a manufacturer may terminate or not renew a

franchise agreement *only* if such termination is done in good faith, with good cause and not in an

arbitrary or unconscionable manner. Instead, GM attempts to twist and mangle M.G.L.A. c. 93B,

§ 12 to read M.G.L.A. c. 93B § 5(a) out of the statute and to allow manufacturers to do in mass,

that which they cannot do on an individual basis. GM's misconstruction of the statute is so

blatant that it represents that if a manufacturer is terminating an entire brand, "*all* that the statute

requires is that 'a manufacturer . . . send notice to a motor vehicle dealer in writing at least 60

days before the contractual term of its franchise agreement expires when the same will not be

renewed stating the specific grounds for the nonrenewal.'" (Def.'s Mem. In Supp. Of Mot. To

Dismiss at 6) (Emphasis Added).

The absurdity of GM's interpretation of M.G.L.A. c. 93B is best illustrated by way of a

hypothetical example. Under GM's version of c. 93B, if all Chevrolet dealers in the United

States formed an association to protect the rights of Chevrolet dealers and GM disfavored the

existence of this association for any reason whatsoever, GM could simply not renew all

Chevrolet dealer agreements and redistribute all Chevrolet models under some other brand that it

manufactures as long as GM gave the required 60 days notice. Any interpretation of the statute

that would allow such a result is patently illogical and completely ignores the intent of the

Massachusetts Legislature in enacting good faith and good cause requirements.

GM's reliance on M.G.L.A. c. 93B, § 12 is severely misguided, for it provides, "If a

–3–

manufacturer or distributor renews its franchise agreements periodically, *it shall do so as their contractual periods expire* on terms equally available to all of its motor vehicle dealers in the commonwealth unless there is good cause to do otherwise." (Emphasis added). The notion that this section somehow allows manufacturers to not renew without good cause is ridiculous. Instead, this section provides an obligation on the part of the manufacturer when renewing dealer agreements, as GM did in late 2000 just prior to its announcement of the Oldsmobile phase-out, to make the terms of the new agreement equally available to all dealers. Simply put, upon renewal, the manufacturer cannot discriminate among its dealers by providing more favorable terms of the dealer agreement to one dealer over another. In this instance, any reliance by GM on this section is inapposite, for GM is failing to renew the franchise agreement of Plaintiff. In fact, if either side is aided by M.G.L.A. c. 93B, § 12, it is the Plaintiff for it provides that, manufacturers such as GM, who periodically renew dealer agreements "shall" renew the franchise agreements.

It is noteworthy and telling that GM, in its Memorandum in Support of its Motion to Dismiss does not even attempt to argue that the termination or non-renewal of Haskins is for good cause as required by M.G.L.A. c. 93B, § 5(a). As a matter of fact and law, GM has stated no reason in its notice, nor could it even manufacture a "reason" for its failure to renew Haskins's Oldsmobile franchise which would satisfy the "good cause" requirement of M.G.L.A. c. 93B, § 5.

First, Haskins has not violated any provision of GM's Oldsmobile franchise agreement. Secondly, GM's Oldsmobile franchise does not contain any provision which permits GM to cancel, terminate or not renew a franchise because GM has determined to stop production of a

–4–

particular passenger car brand and devote those freed resources to the other passenger car lines it has decided to promote and continue.

There is a good reason why such a provision does not appear in any GM franchise agreement. It is because GM could not induce any person, under any circumstances, to invest the millions of dollars required to create and perpetuate a new motor vehicle dealership if GM had the right to simply eliminate a brand and walk away free from its commitment.

GM's Oldsmobile franchise does not allow for non-renewal based upon the discontinuation of the brand. To the contrary, Haskins's Oldsmobile franchise agreement virtually guarantees a franchise renewal in 2005. The single condition precedent to this guarantee is the requirement that Haskins abide by the terms of the franchise agreement. It is not subject to dispute that Haskins has satisfied this single condition and is entitled to renewal by the express terms of the franchise agreement drafted in toto by GM.

Although GM tries to create a nonexistent exception to M.G.L.A. c. 93B, § 5(a) to allow for its elimination of the Oldsmobile brand and subsequent non renewal of Haskins's franchise agreement, GM never posits the argument that the elimination of Oldsmobile was nondiscriminatory and therefore in satisfaction of the "good cause" requirement.

Although GM tries to create a nonexistent exception to M.G.L.A. c. 93B, § 5(a) to allow for its elimination of the Oldsmobile brand and subsequent non renewal of Haskins's franchise agreement, GM never directly posits the argument that the elimination of Oldsmobile was nondiscriminatory and therefore in satisfaction of the "good cause" requirement.[2] In fact, GM has

---

[2] A survey of various state franchise laws reveals that a "good cause" requirement is found in almost every state statute which addresses the circumstances under a manufacturer may

–5–

rarely argued that its elimination of the Oldsmobile brand meets the "good cause" requirement of any state's dealer protection statute. This is because GM has not abandoned the market for the manufacture and sale of passenger motor vehicles. Such a defense, under the circumstances of this case is patently absurd.

GM is well aware of what is required to actually be in the position to legitimately claim a nondiscriminatory market abandonment as a defense to the cancellation or non-renewal of a franchise agreement, yet GM did not cite a single case to support a this defense to its violation of M.G.L.A. c. 93B, § 5. In order to properly claim this defense, a manufacturer must have withdrawn completely from an entire market segment such as heavy-duty trucks or passenger automobiles. GM knows this as it was involved in such a market abandonment in the late nineteen eighties. The defense cannot stand when the manufacturer's feigned abandonment is no more than a name change or the reallocation of product for the same market segment to its remaining brands. A quote from one of the cases which addressed GM's abandonment of the heavy duty truck market in 1988 sums up the mandate that the abandonment must be complete with respect to that entire market segment.

> The most forceful argument marshaled by GM in its own defense is the contention
> that § 218.01 is inapplicable to cases where a dealer franchise is cancelled upon
> the manufacturer's decision to embark upon **a complete and nondiscriminatory**
> **withdrawal from a product market. GM contends that it has engaged in a**
> **total withdrawal from the heavy-duty truck market in North America**, and

legally terminate or not renew a franchise agreement.

consequently cannot be found to have cancelled a franchise with Mid-State

without due regard for the interests of its dealers.

(emphasis added). *Mid-State Truck Service, Inc. v. General Motors Corp.*, 1988 WL 148432, 8 (W.D.Wis. 1998).

Indeed, what GM has done is to reconfigure the allocation of its resources to buttress its six remaining passenger vehicle brands. These brands, such as Buick, continue to sell passenger automobiles which are in every respect identical to the passenger vehicles sold under the Oldsmobile moniker. The fact of the matter is that GM is now and will remain in the North American market for private passenger automobiles. This is why GM made no attempt in its motion to weave any set of facts, frame any viable argument or cite any competent authority to support its claim that the elimination of Oldsmobile was a complete nondiscriminatory market withdrawal from the class of vehicles sold under the Oldsmobile Brand.

## B. Massachusetts Provision Relating to Vehicle Allocation

GM's argument with respect to Haskins's claim for violation of M.G.L.A. c. 93B, § 4(c)(1) for arbitrary or unfair allocation of motor vehicles is founded, in large part, on GM's claim that a product discontinuation allows manufacturers to ignore the termination requirements set forth in M.G.L.A. c. 93B, § 5(a) and therefore cannot constitute a basis to claim a violation of other related statutory provisions. As has been detailed above, GM is wrong as its initial argument not only misrepresents the requirements of section chapter 93B, but also ignores, in toto, the very language which requires that a non-renewal or termination be for good cause, in good faith, and not arbitrary or unconscionable for a failure to renew to be legal. Accordingly, this element of GM's argument must fail because there is nothing in Chapter 93B which provides

–7–

that GM has the right to destroy a dealer's investment in a franchise at GM's sole discretion.

GM further claims that no violation of M.G.L.A. c. 93B, § 4(c)(1) occurred because GM has terminated all Oldsmobile dealers and because it claims the statute does not apply to "cross-brand discrimination." As has been previously held by a court considering an almost identical statutory provision, a plain reading of the statute belies GM's position. *See* Exhibit 5 to GM's Memorandum: *Sullivan-Parkhill Holdings, Inc. v. General Motors Corp.*, Order at 4, No. 03-2032 (C.D. Ill. Sept. 5, 2003) (finding that "the statute does not limit the definition of motor vehicle dealers and that arbitrary and capricious decisions could be made among the various line-make dealers"). The statute provides that it is unlawful for a manufacturer "to adopt, change, establish or implement a plan or system for the allocation or distribution of new motor vehicles to motor vehicle dealers which is arbitrary or unfair or to modify an existing plan so as to cause the same to be arbitrary or unfair." M.G.L.A. c. 93B, § 4(c)(1). As in the statute examined in *Sullivan-Parkhill*, chapter 93B does not limit the definition of motor vehicle dealers to those of the same line-make, and as a result, arbitrary and capricious decisions can be made among various line-make dealers, particularly where, as here, the GM is taking some of the exact same cars that were once called "Oldsmobiles" and rebadging them as other GM brands.

### C. Massachusetts Provisions Against Unjust Benefits to Manufacturer

Haskins has alleged that GM has violated M.G.L.A. c. 93B, § 4(c)(9) which provides that it is unlawful for the manufacturer:

> to obtain money, goods, services, anything of value, or any other benefit from any other person with whom the motor vehicle dealer does business, on account of or in relation to the transactions between the dealer and the other person as compensation except for services actually rendered, unless the benefit is promptly accounted for and transmitted to the motor vehicle dealer.

–8–

Haskins has adequately and correctly alleged, in accordance with Rule 8 of the Federal
Rules of Civil Procedure, that GM has obtained and utilized Haskins's customer lists for the
benefit of GM and other GM brands without accounting for these benefits to Haksins.

Again GM has tried to read in limitations that do not exist in Chapter 93B. GM claims
without substantiation or support of any kind other than its own musings, that the above cited
section is limited only to those instances when manufacturers seek "to impose a 'surcharge' on a
dealer's customers for benefits provided to the customer by the dealer." GM's "interpretation" of
this statute is lacking, and the allegations of Haskins, as pleaded, fall directly within the plain
language of M.G.L.A. c. 93B, § 4(c)(9), and the intent of Chapter 93B as set forth in *Beard*.

### D.  Massachusetts Provisions Against Coercion

GM claims that the TFAP offer it made to Haskins was not coercive and therefore could
not violate M.G.L.A. c. 93B, §§ 4(c)(4) and 4(c)(11). GM's TFAP offer, as set forth in the
Complaint, is the epitome of coercion. Haskins was faced with GM's proposition to either
accept the TFAP offer, or have its Oldsmobile franchise terminated and lose virtually the entire
value of its business. GM attempts to sidestep its coercive acts by claiming that Haskins was
able to pursue and ultimately did pursue legal remedies. However, the availability and utilization
of other legal remedies by Haskins do not prevent Haskins from bringing an action against GM
for coercive activities and do not relieve GM from the burden of refraining from such actions.

### III.  CHOICE-OF-LAW

GM argues that the choice-of-law provision in Haskins Oldsmobile franchise is broad and
that each claim made by Haskins should be governed by Michigan law. Despite GM's argument

that Haskins's claims should be governed by Michigan law, Massachusetts law specifically

provides that "[n]othwithstanding any term or provision of a franchise agreement to the contrary .

. . the laws of the commonwealth shall govern the interpretation of the franchise agreement of a

motor vehicle dealer located in the commonwealth and the performance of the parties

thereunder." M.G.L.A. c. 93B, § 15(e). GM cites *Bertera Chrysler Plymouth, Inc. v. Chrysler

Corp.*, 992 F. Supp. 64 (D. Mass. 1998) and *Davidson v. General Motors Corp.*, 786 N.E.2d 845

(Mass. App. Ct. 2003) for the proposition that the Court should apply the choice of law provision

as set forth in the franchise agreement. Citation to these cases is inapposite as *Bertera* was

decided before the current version of § 15(e) was enacted and the choice of law provision in

question in *Davidson* was not in a dealer franchise agreement.

Notwithstanding the provisions of § 15(e), the choice-of-law provision as set forth in the

franchise agreement between GM and Haskins should not govern the claims of Plaintiff. The

undersigned could not locate a Massachusetts case which directly addressed the scope of GM's

choice-of-law provision as written. However, sister courts have construed the scope to be given

to the language GM employed in drafting its Oldsmobile franchise choice-of-law provision.

These cases have uniformly concluded that GM's choice-of-law provision is narrow and

restricted to construing the franchise agreement itself. In sum, these courts determined that the

GM style choice-of-law provision is so narrow in scope as to not govern any and all relations,

conduct or disputes between the parties. Given maximum effect, the GM choice-of-law provision

only extends to dictate that Michigan's rules of contract construction be employed in construing

the GM franchise agreement.

A choice-of-law provision virtually identical to the instant one was at issue in *Greystone*

–10–

*Community Reinvestment Associates, Inc. v. First Union Nat. Bank*, 2002 WL 229901, \*2

(D.Conn. Jan 25, 2002) where a contract provision providing that the agreement was "governed"

by New York law was deemed a "narrow" choice-of-law provision which did not govern other

claims made in the complaint:

> [A] narrow choice-of-law provision may not apply to related non-contract claims .
> . . the choice-of-law provision in the confidentiality agreement provides that the
> agreement "shall be governed and construed in accordance with the laws of the
> State of New York." . . . Given that the plaintiff's CUTPA claims appears to be
> based on its tort claims as well as breach of contract claims, the Court cannot
> conclude at this time that the plaintiff has failed to state a claim under CUTPA.

*See also Magellan Real Estate Inv. Trust v. Losch*, 109 F.Supp.2d 1144 (D.Ariz. 2000) (choice-

of-law provision narrow where it provided that "agreement shall be governed by and construed in

accordance with the laws of the province of Ontario and the laws of Canada applicable therein

and this agreement shall in all respects be treated as an Ontario contract."); *Benchmark

Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003) ("The parties' contract

provides that the 'Agreement shall be governed by, and construed in accordance with, the

internal laws of the State of New York....' . . . The contractual choice of law clause does not,

however, address the parties' entire relationship; Benchmark's claims of fraud and negligent

misrepresentation are not governed by the parties' narrow choice-of- law provision. The

provision at hand is narrow because it deals only with the construction and interpretation of the

contract.")

Since Massachusetts law does differ in some material respects with the law of Michigan,

this answer will address the application of the laws of both states to the instant Complaint where

applicable.

–11–

## IV.    THE CONTRACT CLAIMS

### A.    The Renewal Provision

GM asserts that Haskins cannot bring an action based on GM's October 27, 2004,

announcement that it would not, under any circumstances, renew Haskins's Oldsmobile franchise

agreement. "A cause of action based in contract arising out of a breach of duty accrues at the

time of the actual act of [sic] omission." *Williams v. Polgar*, 391 Mich. 6; 215 NW2d 149

(1974); *Herman v. Ford Motor Co.*,  119 Mich.App. 639, 645, 326 N.W.2d 590, 593 (1982).

Under Michigan law, Haskins has two options, one is to sue now for GM's unequivocal

acknowledgment  that it will not honor its renewal obligations or wait for the time for

performance. Since GM's denouncement of the renewal provision is absolute, it behooves no

one, including this Court, to wait for the inevitable to occur at the time for performance. "Under

the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a

contract unequivocally declares the intent not to perform, the innocent party has the option to

either sue immediately for the breach of contract or wait until the time of performance." *Stoddard

v Manufacturers National Bank of Grand Rapids*, 234 Mich.App 140, 163; 593 NW2d 630

(1999). See also *Paul v. Bogle*, 193 Mich.App. 479, 493-494, 484 N.W.2d 728 (1992) (same

result); *Benson Associates, Inc. v. Bodytechniques, Inc.*, 2002 WL 1308350, *10 (Mich.App. Jun

11, 2002) (explaining that if a party to a contract unequivocally conveys the intent not to perform

the innocent party may either sue immediately for the breach or await the time for performance);

*Brauer v. Hobbs*, 151 Mich.App. 769, 391 N.W.2d 482 (Mich.App. 1986)  (same rule and

-12-

result).[3]

In its argument, GM takes some liberty with the law. On page 10 of GM's Memorandum it quotes *Hettrick Mfg. Co. v. Waxahachie Cotton Mills*, 1 F.2d 913, 919 (6th Cir. 1924) for the proposition that a party must first completely repudiate and cancel a contract before a suit can be brought on anticipatory breach.[4] This is an Ohio case discussing Ohio law as is GM's other main

_____

[3]GM has cited *Seabord Sur. Co. V. Town of Greenfield*, 266 F.Supp.2d 189 (D. Mass. 2003) and *F.D.I.C. v. Source One Mortg. Services Corp.*, 844 F.Supp. 40 (D. Mass. 1994) for the proposition that Massachusetts does not generally recognize the doctrine of anticipatory repudiation. However, Massachusetts have carved out exceptions to this general rule, including the ability to bring suit where, as here, there is an actual breach accompanied by an anticipatory breach. *Cavanagh v. Cavanagh*, 598 N.E.2d 677, 679 n. 6 (Mass. App. Ct. 1992); *see also Carrig v. Gilbert-Varker Corp.*, 50 N.E.2d 59 (Mass. 1943) (holding that a contractor's refusal to continue under the contract to construct homes while Plaintiff stood ready to perform was a present breach and actionable). Further the general rule against actions traditionally labeled as anticipatory repudiation is not applicable where a party shows "a refusal or neglect to perform, at a time when and under conditions such that he is or might be entitled to require performance from the other party." *Carrig*, 50 N.E.2d at 62 (Citations omitted).

[4] The actual quote in the GM serial citation reads "[I]n order to enable the [Plaintiff] to sue on such an anticipatory breach, he must accept it as such, and consider the contract at an end. If he elects to consider the contract still in force, he cannot recover. . . ."

−13−

cited case, *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597 (6th Cir.) 1988). In a serial citation, following the *Hettrick Mfg. Co.* quote, GM cites two Michigan cases; *Stoddard v Manufacturers National Bank of Grand Rapids*, 234 Mich.App 140, 163; 593 NW2d 630 (1999) and *Brauer v. Hobbs*, 151 Mich.App. 769, 391 N.W.2d 482 (Mich.App. 1986). There can be no doubt that GM is representing that these Michigan cases either contain the identical language in the Ohio case of *Hettrick Mfg. Co.* or contain the identical prohibition on bringing an anticipatory action without first repudiating the entire contract. Neither *Stoddard* nor *Brauer* contain any such language or any such prohibition as that set forth in *Hettrick*. In fact, the above Michigan cases, along with a host of others, support the action Haskins has taken in this case.

There is no Michigan case that mandates that in order to sue for a present repudiation of a future covenant, in an almost fully executed contract, that the entire contract has to be repudiated. Such law simply does not exist in Michigan. Indeed, such a requirement creates an absurd result and overrides the competing requirement that a party make all due effort to mitigate its damages.

Moreover, there is nothing unique in the remedy of bringing a claim for breach when a party renounces all intention of honoring some singular future covenant. The cases upon which GM relies relate to the anticipatory breach of a contract dependent upon the completion of a single action which was the heart of the contract. The repudiation of such a contract is logical since the completion of that single essential act completes the contract. Any requirement other than repudiation would allow a party to receive the total benefit of the contract and the possible gain from a lawsuit which would amount to a double recovery.

In the present case, there is no such possibility of double recovery because the Oldsmobile franchise agreement is not premised upon the completion of a single essential act

–14–

which is, in effect, the entire contract. The sales and service agreement between GM and Haskins

covers the performance of many aspects of the relationship - including the purchase of vehicles

for sale, the performance of service upon Oldsmobile vehicles, the advertisement and promotion

of the Oldsmobile brand and the automatic renewal of the agreement.

In this case, GM has breached a single renewal provision in an almost fully executed

contract. Haskins should not be barred from seeking damages for GM's fully acknowledged

breach in not renewing the contract when Haskins has continued to maintain and abide by every

term of the contract for the benefit of both parties. Because GM has continued to benefit from

Haskins's continued respect for the franchise agreement, it cannot claim to be prejudiced in any

way by Haskins's claim. Haskins should not be penalized for attempting to mitigate its damages

by continuing to honor its obligations to GM under the contract.

## B.    *County Motors* and Article 4.1 of the Dealer Agreement

GM argues that Article 4.1 does not impose an affirmative obligation on GM. *County*

*Motors, Inc. v. General Motors Corp.*, 278 F.3d 40, 42 (1st Cir. 2002), when fairly considered, as

well as a number of unpublished federal decisions in Exhibit 5 to GM's Memorandum, hold

Article 4.1 to be an obligation of GM.

*County Motors* can be read no other way except as to establish that Article 4.1 is an

obligation of GM. In order to fully appreciate the magnitude of the *County Motors* holding

regarding Article 4.1, a comment on GM's Dealer Agreement is necessary. Every GM dealer is

assigned an "Area of Primary Responsibility." The Area of Primary Responsibility is the

geographical area of sales and service responsibility GM assigns to each GM dealer.  GM claims

by contract that "General Motors retains the right to revise Dealer's Area of Primary

–15–

Responsibility **at General Motor's sole discretion**." Sole discretion is discretion without constraint.

The gravamen of the dispute in *County Motors* was GM's decision to relocate a Pontiac dealer on the same road as County Motors and within County Motors' existing Area of Primary Responsibility. It is self-evident that a second Pontiac dealer within the immediate sales area of County Motors would, by definition, impact the return on its investment in its GM franchise. This is the very concern of Article 4.1. The Areas of Primary Responsibility of GM dealers generally do not overlap. *Id.* at 42. GM was therefore required to modify County Motors' Area of Primary Responsibility in order to facilitate the relocation of the new Pontiac dealer.

*County Motors* holds that GM cannot "arbitrarily" modify a dealer's Area of Primary Responsibility and cites to Article 4.1 which permits each dealer the "opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement." GM's unbridled "sole" discretion was suddenly reduced to discretion that could not be arbitrarily exercised. The limitation on GM's otherwise unbridled discretion derived from the dealer's right to a reasonable return on investment (Article 4.1). *County Motors* not only construed Article 4.1 to be an obligation of GM, but used that obligation to impose limitations upon discretion that GM claims by right to exercise.

In the instant case, GM has done much more than merely modify Haskins's Area of Primary Responsibility–GM has eliminated Haskins's franchise altogether by rendering it worthless. GM has by its action, eliminated all possibility of any return on investment and this claim should be actionable. *See,* Exhibit 5 to GM's Memorandum: *Andrews*, Order at 7; *Basil*, Report and Recommendation at 11-14; *Biddulph*, Order at 3-4: *Lokey*, Order at 5-6; *Nester*,

-16-

Order at 2; *Robinson*, Order at 13-14; *Shakopee*, Report and Recommendation at 10-11.

### C.    Articles 6.1 and 6.41

GM has methodically eliminated Oldsmobile models for the past three years. Additionally, on April 29, 2004, GM produced its last Oldsmobile product notwithstanding that Haskins's Oldsmobile franchise continues through 2005. The decimation of the Oldsmobile dealer network was accomplished by slowly removing models and series of models to make Oldsmobile an unmarketable brand long before its final days had arrived.

GM had an obligation under its franchise agreement to provide a sufficient mix of models and series of models to give an Oldsmobile dealer the semblance of an opportunity to entice the public to purchase an Oldsmobile product. Oldsmobile products have declined continuously to the point where in 2005, dealers had no new product to sell for the model year. At a minimum, the allegations in the Complaint create a question of fact as to whether or not GM has violated its obligation to its Oldsmobile dealers to "distribute new Motor Vehicles among its dealers in a fair and equitable fashion" (Article 6.1- Standard Provisions) and whether GM has provided "a reasonable quantity and variety of current model Motor Vehicles" adequate to permit a reasonable return on investment, maintain a marketable inventory and to meet Dealer's sales expectations in its Area of Primary Responsibility (Article 6.4.1- Standard Provisions).

The issue of whether GM has acted in a fair and equitable manner in the exercise of its discretion to distribute motor vehicles is a question of fact for a jury.

### D.    The Termination Provisions

Michigan has embraced the concept of de facto terminations. In *Auto Elec. & Serv. Corp. v. Rockwell Int'l. Corp.*, 314 N.W. 2d 592, 595(Mich.App.1982), the Court found that the

–17–

defendant's **"conduct"** amounted to a "de facto termination" as defendant had "effectively prohibited plaintiff from maintaining its business."

Haskins has pleaded the predicate facts in detail to establish a de facto termination of its franchise agreement. This de facto termination is in violation of the express termination provisions set forth in the Oldsmobile franchise agreement. Simply stated, GM has acted to terminate Haskins's franchise in violation of the terms of the franchise agreement (Article 14). If Haskins can show that it has been effectively terminated in accordance with Michigan law and that such termination was not justified under the express terms of the franchise agreement, then Haskins can prove, with relative ease, that GM has breached the termination provisions of the franchise agreement.

## V.    UNJUST ENRICHMENT

### Michigan Law

GM again makes the blanket assertion that a claim for breach of an express contract cannot reside within the same complaint as a claim for unjust enrichment. This is patently incorrect. A claim of unjust enrichment can be made in conjunction with a claim for breach of contract for matters not expressly covered by the contract. Moreover, unjust enrichment can be plead as an alternative theory of liability to breach of contract,

> Pursuant to MCR 2.111(A)(2), plaintiff was entitled to bring alternative counts of breach of contract and implied contract... As stated by this Court.., plaintiff was not required to elect to proceed under one theory or the other, but could seek recovery on the basis either of an express verbal contract, or an implied contract if the [trier of fact] found that the express verbal contract did not exist.

*H.J. Tucker & Assoc., Inc. v. Allied Chucker and Eng. Co.,* 595 N.W.2d 176, 188 (Mich. Ct. App.1999). Plaintiff cannot recover on both theories for the same subject matter, but can recover

–18–

on one or the other. At this juncture, the answer to these issues is a matter of disputed fact. The

count is sufficiently plead, and it is black letter law that the counts of breach of contract and

unjust enrichment can stand together in a single complaint.

**Massachusetts Law**

Massachusetts law, with respect to the pleading of unjust enrichment is  substantially

similar to Michigan law.  It is clear that the counts of breach of contract and unjust enrichment

can stand together in a single complaint, and that recovery for unjust enrichment is an available

remedy where the wrong that the action seeks to redress is outside the express contract.  *See Fox*

*v. F&J Gattozzi Corp.*, 672 N.E.2d 547 (Mass. App. Ct. 1996).

## VI.    IMPLIED GOOD FAITH AND FAIR DEALING

**Massachusetts Law**

Every contract implies a covenant of good faith and fair dealing between the parties to the

contract.  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991).  The

implied covenant of good faith and fair dealing provides that neither party to the contract shall do

anything that will have the effect of destroying or injuring the right of the other party to receive

the full benefits of the contract.  *Id.*  Further, Massachusetts courts have found that wrongful

termination of a contractual agreement can be a breach of the implied covenant of good faith and

fair dealing.  *See Cherick Distribs., Inc. v. Polar Corp.*, 669 N.E.2d 218 (Mass. App. Ct. 1996).

While GM is correct in its assertion that the covenant of good faith and fair dealing does

not override the express terms of the contract, GM's bald assertion, that Plaintiff has attempted to

impose duties greater than those in the dealer agreement, is completely unsupported and does not

constitute suitable grounds for granting a motion to dismiss.  Instead Haskins's claim for breach

of the implied covenant, as set forth in the Complaint, specifically sets forth the contractual rights
of Haskins which were impaired as a result of GM's bad faith actions and, as a result, presents a
question of fact not suitable for disposition in a motion to dismiss. *See Cherick*, 669 NE.2d at
220 (finding that whether defendant's actions violated the covenant of good faith and fair dealing
was a question of fact properly put to the jury).

**Michigan Law**

GM omits in its discussion any mention that the exercise of a party's discretion in the
performance of contractual obligations is the primary area in which the covenant of good faith is
applied under Michigan law. It is indisputable that the exercise of contractual discretion can be
the subject of a covenant of implied good faith claim. *See Hubbard Chevrolet Co. v. General
Motors Corp.*, 873 F.2d 873, 876-77 (5th Cir.1989) (stating, "[c]onsistent with this
supplementing function, Michigan courts rely on the implied good faith covenant '[w]here a
party to a contract makes the manner of its performance a matter of its own discretion....');
*Ferrell v. Vic Tanny*, 357 N.W.2d 669, 672 (Mich. Ct. App.1984); *Burkhardt v. City Nat'l Bank*,
226 N.W.2d 678, 680 (Mich. Ct. App.1975) (stating "[w]here a party to a contract makes the
manner of its performance a matter of its own discretion, the law does not hesitate to imply the
proviso that such discretion be exercised honestly and in good faith.").

GM attempts to skirt the decisions of these courts by citing to two cases, which do not
discuss at any length the reasoning for denying implied covenant of good faith claims. Both of
these cases can be distinguished from the present case.

In *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich.App. 463, 666 N.W.2d 271 (2003)
the court, without any further discussion, concluded that an implied covenant of good faith and

–20–

fair dealing did not exist in Michigan. The underlying circumstances of the *Belle Isle* case, however, do not involve discretion in the performance of a contract as in the *Hubbard*, *Ferrell*, and *Burhardt* cases cited *supra*. The underlying basis of the plaintiff's claim in *Belle Isle* was a breach of implied warranty in a lease, for which the court found express disclaimers of warranties in the lease. There was no discussion by the court of defendant's discretion in performance of the lease.

In the later rendered decision of, *Certified Abatement Servs., Inc. v. Dept. of Mgmt. and Budget*, No. 245307, 2004 WL 136835, *2 (Mich.App. Jan. 27, 2004), which cited to *Belle Isle*, the court recognized the *Burkhardt* holding, but distinguished, stating that in *Certified* the defendant's manner of ***performance*** was not discretionary. The recognition of *Burkhardt* in the *Certified Abatement* decision confirms that a cause of action for a violation of the covenant of good faith and fair dealing does exist in Michigan when founded upon the exercise of a party's discretion. In the present case, the discretion GM has chosen to exercise is in its performance of the sections of sales and service agreement which require compliance on the part of GM. These cases cited by GM are therefore distinguishable from the present case.

Haskins's claim is focused solely upon the manner in which GM exercised its discretion under the franchise agreement. Given that the exercise of GM's discretion is the salient subject of this claim, it should stand.

## VII. CONCLUSION

For the foregoing reasons, GM's Motion to Dismiss should be denied and this cause should go forward on the merits.

Respectfully submitted,

**Kevin C. Cain (BBO # 550055)**
**PEABODY & ARNOLD, LLP**
30 Rowes Wharf
Boston, MA 02110
Telephone (617) 951-2100
Facsimile (617) 951-2125

and

**Richard N. Sox, Jr.** (Fla. Bar #982156)
**W. Douglas Moody** (Fla. Bar #301779)
**MYERS & FULLER, P.A.**
2822 Remington Green Circle
Tallahassee, Florida 32308
Telephone (850) 878-6404
Facsimile   (850) 942-4869

**ATTORNEYS FOR PLAINTIFF**

CERTIFICATE OF SERVICE
I hereby certify that I served a copy of the foregoing
pleading on all parties by mailing same, postage
prepaid, to all counsel of record.
Signed under the pains and penalties of perjury
DATED: 5/16/05

–22–